In re CITY OF PHILADELPHIA
LITIGATION.

Ramona AFRICA

v.

CITY OF PHILADELPHIA, et al.

Louise JAMES, Administratrix of
the Estate of Frank James

v.

CITY OF PHILADELPHIA, et al.

Alfonso LEAPHART, Administrator of
the Estate of Vincent Leaphart

v.

CITY OF PHILADELPHIA, et al.

Master File No. 85–2745.
Civ. A. Nos. 87–2678, 85–3528 and 87–2756.

United States District Court,
E.D. Pennsylvania.

Jan. 18, 1996.

Andre L. Dennis, Stradley, Ronon, Stevens & Young, LLP, Philadelphia, PA, for Ramona Africa.

Ramona Africa, Philadelphia, PA, pro se.

Arlene F. Bell, City of Philadelphia, Law Department, Philadelphia, PA, Debra M. Russo, Philadelphia, PA, E. Jane Hix, City of Philadelphia Law Dept., Philadelphia, PA, for City of Philadelphia.

Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, for Willie Goode.

Steven R. Waxman, R. James Kravitz, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, for Leo A. Brooks.

Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, John W. Morris, Philadelphia, PA, for Gregore Sambor.

Stephen J. Imbriglia, Hecker, Brown, Sherry and Johnson, Philadelphia, PA, Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, Peter C. Kennedy, Hecker, Brown, Sherry and Johnson, Philadelphia, PA, for William Richmond.

Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, for Frank Powell, Lt.

John R. O'Donnell, Zarwin & Baum, P.C., Philadelphia, PA, Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, for William Klein.

Laura Fredricks, Deputy Attorney General, Philadelphia, PA, Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, John O.J. Shellenberger, III, Office of Attorney General, Philadelphia, PA, for Morris Demsko, Richard Reed.

Fincourt B. Shelton, Darby, PA, for Louise James.

Rosemarie Rhodes, Harper & Paul, Philadelphia, PA, for Alfonso Leaphart.

## OPINION *

LOUIS H. POLLAK, Senior District Judge.

The questions to be addressed this afternoon are motions filed by the defendants Brooks, Sambor and Richmond.

The motions filed by these defendants relate to the claims which the plaintiffs have brought against these defendants under state law, that is to say the law of Pennsylvania, alleging that the events surrounding the dropping of the bomb back in May of 1985 generated liability under state law against these defendants.

As those familiar with this litigation know and know well, the state law claims are one portion of a litigation which, insofar as the jurisdiction of this court is concerned, took its inception in claims arising under federal law both against these defendants and other individual defendants who are no longer in the case and against the City of Philadelphia.

And the entire controversy has been before the courts at various levels for many years. The litigation was before Magistrate Judge Hall, it was before me, and most recently it was before the Court of Appeals which disagreed with various rulings which I had made and the matter is now back before me once again.

Certain issues have, since the remand from the Court of Appeals, already been addressed in a memorandum opinion issued last month that dealt with certain motions by the plaintiffs to reinstate certain claims which had theretofore been dismissed by me. And I have concluded that reinstatement of those claims was appropriate.

---

* This is a transcript of a bench opinion delivered on January 18, 1996, which has been slightly edited for clarity.

What today we are addressing are the claims that remain under the law of Pennsylvania as they relate to the defendants Brooks, Sambor and Richmond. There are two grounds on which dismissal or, in the alternative, summary judgment is sought with respect to those claims.

The first ground to be discussed is the contention that because there are no longer any federal claims pending in this litigation against these three defendants, there is no longer occasion for this court to address state claims against these defendants.

The second ground for the motions is that, so it is contended, even if this court has authority—that is to say jurisdiction, and a jurisdiction that discretion suggests should be exercised—to entertain state law claims against these defendants notwithstanding that there are no longer federal claims pending against them, the record would not support a finding of liability against any of these three defendants.

Specifically, the contention is that these three defendants are immune from liability under the law of Pennsylvania unless they have engaged in what the statute law of Pennsylvania calls "willful misconduct." And it is contended on behalf of all three of these defendants that the record could not support a finding of willful misconduct.

Now, let me turn first to the contention of the defendants that I am without jurisdiction or, as it may alternatively be phrased, that if I have jurisdiction to entertain the state law claims, it would be an abuse of discretion to exercise that jurisdiction.

Basically, what is at issue here is the following: this case was brought in this federal district court on the ground that the actions of the many individual defendants who were initially named, and of the City of Philadelphia, were actions that gave rise to liability under federal law, specifically, the Constitution of the United States and, most precisely, the Fourth Amendment of the Constitution (via the Fourteenth Amendment).

There were, to be sure, other constitutional claims made but those have gone by the wayside as this case has proceeded and the focal issue on the federal side of the case was whether the dropping of the bomb, the events attendant on that dropping, and the fire that ensued, constituted transgressions of the Fourth Amendment which had victimized these plaintiffs.

Conjoined with the federal claims were state law claims arising out of precisely the same events and asserting that, under the law of the Commonwealth, public officials had engaged in conduct which constituted, within the meaning of the law of Pennsylvania, a use of excessive force: the dropping of a bomb and the letting a fire burn in order to undertake to accomplish the arrests of the several persons—members of the so-called MOVE group—whom the law enforcement authorities of the City were trying to arrest.

The state law claims could be pursued in this court because they were linked to federal claims which grew out of the very same events. It was the federal claims that provided the basis in federal jurisdiction for this court to have the state law claims, known as pendent claims, claims that depend on the existence of the initiating federal claims.

After extended litigation it was my view as of early 1994 that this case could go to trial both on federal claims and on state claims, that federal claims were assertable against the City of Philadelphia and also against these three individual defendants. General Brooks was the City's Managing Director, Commissioner Sambor was the Commissioner of Police, and Commissioner Richmond was the Fire Commissioner. It was my view that that set of federal claims could be tried together with state law claims.

The Court of Appeals, in a decision last year, concluded that I was in error in supposing that Messrs. Brooks, Sambor and Richmond were suable on the federal claims. Those three officials, the Court of Appeals concluded, were entitled to immunity from suit and hence as to them these actions cannot be maintained.

That meant that the federal claims to be tried in this court would be claims that would lie solely against the City of Philadelphia.

██ The three individual defendants having been dismissed from the federal case now

take the position that there are no longer federal claims against them to which state claims against them can be attached as so-called pendent claims.

Their argument is not without force. As I have undertaken to suggest, the general architecture of this lawsuit was one which predicated the state law claims as claims which were assertable in this court because they were pendent to claims against the same defendants, Messrs. Brooks, Sambor and Richmond, which were in this court because of their federal character.

With the federal claims against these three defendants removed, so the argument runs, there is no longer a basis for a federal court to entertain lawsuits which are solely based on state law against these three defendants.

It would appear that the argument would lead to the conclusion that the proper place for assertion of the state law claims is in a court of the Commonwealth, a Common Pleas Court, and not in this United States District Court.

There is language in the rulings of the United States Supreme Court that lends credence to the proposition that a dismissal of federal claims leads to the dismissal of pendent state claims. A lot of authority running in this direction can be found in the *Gibbs* case which is perhaps the principal early doctrinal exposition of the relationship between federal claims and pendent state claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725–29, 86 S.Ct. 1130, 1138–41, 16 L.Ed.2d 218 (1966).

More fully articulated, however, the jurisprudence of the Supreme Court appears to be that when federal jurisdiction has attached as an initial matter through the assertion of federal claims together with pendent state claims, and those federal claims remain before the Court for some significant period of development of the case, that is to say they are not dismissed right at the outset on a motion to dismiss, the question whether the later dismissal of the federal claims in turn calls for dismissal of the state claims is no longer a question of power, that is jurisdiction in the formal sense, but one of discretion.

It is my view that in this case which has been before this Court for many, many years (it is to be recalled that the underlying events took place almost eleven years ago) I have jurisdiction to entertain the state claims against these three defendants, notwithstanding that there are no longer any federal claims pending against them. The question is whether it is prudent for me to exercise that jurisdiction.

If there were no federal case to be tried I think it would be very difficult to make a persuasive case—not impossible but at least difficult to make a persuasive case—that I should retain the state claims and convert myself, as it were, into a Court of Common Pleas trying a case that had no federal dimension.

Even under those circumstances I would be slow to dismiss pendent state claims unless it were fully understood that those claims could be reasserted in state courts without any state statute of limitations problems—that is to say in effect that the papers here in the federal courts could simply be transferred to a Court of Common Pleas with the expectation that the state claims would be tried promptly in that state court.

The fact is, however, that there is to be a trial of the federal claims. The action brought by the plaintiffs against the City of Philadelphia poses within the framework of federal law questions which arise out of exactly the events which are the stuff of the state law claims against these three defendants.

Given the fact that the federal case is to be tried, and indeed to be tried and relatively soon (trial is scheduled for this spring), I conclude that it would not be a sensible exercise of my discretion to dismiss the state claims and relegate them to state court adjudication in a separate trial at some future time.

The considerations of judicial economy would seem to me clearly to call for my continuing with the responsibility of trying the entire case rather than directing that it be cut in half and imposing upon the parties the burden and expense of trying entirely separately in a state court matters which are

congruent in their fact pattern with the matters to be tried here in the federal court between the plaintiffs and the City of Philadelphia.

So I reject that basis for the defendants' motion to dismiss the state law claims against them.

■ I turn now to the contention that the three individual defendants—Messrs. Brooks, Sambor and Richmond—are immune from suit under the law of Pennsylvania. The question of immunity from suit is, under the law of Pennsylvania, better understood as a question of immunity from liability, and the difference is one of some importance.

Immunity in the federal setting focuses on an entitlement on the part of an official not to be sued for certain activities carried out by that official in the course of his or her duties and under certain circumstances such immunity from suit is conferred. And this very litigation exemplifies that.

The Court of Appeals concluded with respect to the three defendants who are the movants here that they were immune from suit for the reason that, so the Court of Appeals concluded, their actions which they were said to be accountable for were actions which a reasonable public official might have thought—responsibly thought, that is—were agreeable to the Constitution of the United States, not violations of the Fourth Amendment.

Because the Court of Appeals viewed the record before me and before it in that light and disagreed with me in that assessment, the Court of Appeals reversed my conclusion that the three defendants were not immune from suit under federal law and remanded the case to me with directions to dismiss those three former officials as defendants in the federal lawsuit.

The question of immunity under state law differs in two important respects from the question of immunity under federal law. First, the issue of immunity under state law is an issue of immunity from liability. If one is entitled to immunity, damages cannot be imposed on such a person. By contrast, one who is relying on federal immunity would claim that one is immune from suit and would make that claim early on in the litigation and assert that he or she cannot even be brought into the trial court.

And it was because that was an issue that had to be settled prior to trial that the matter of federal immunity came to the Court of Appeals as it did, rather than waiting as one usually waits for the Court of Appeals to review trial action until after the trial court has tried the case.

Because immunity under state law is a question of immunity from liability rather than from being sued as such, the Court of Appeals which reviewed my 1994 ruling concluded through two of the three judges, that it did not have authority to address the question of state law immunity—that that issue arose prematurely, that it was not an issue to be addressed by an appellate court prior to the trial. Now, to be sure, one member of the Court of Appeals disagreed with that view, but I am bound by the ruling of the two members of the majority on that issue.

The result is that the question of whether Messrs. Sambor, Brooks and Richmond, or any of them, should be deemed immune from liability in this case was a question which the Court of Appeals did not rule on.

One judge, Judge Scirica, the judge who thought that the Court of Appeals had authority to review that issue, did opine that yes, indeed, the individual defendants were entitled to immunity from liability under the laws of Pennsylvania. But because his two colleagues felt that the Court of Appeals did not have authority to rule on that issue at this phase of the case, Judge Scirica's observations with respect to the issue of immunity, though quite clearly entitled to very great respect, are not observations that control my disposition of the issue one way or another.

I have said that there are two salient differences between the question of immunity under federal law and the question of immunity under state law. I have noted that the first salient difference is that the federal law addresses immunity from suit by contrast with the state law's immunity which focuses on immunity from liability.

The second difference is in what the standard is for determining immunity under federal law versus the standard for determining immunity under state law. I have already noted that the determination of the Court of Appeals on the federal law issue of immunity was one which came to rest on the proposition that these three defendants were immune from suit because the actions which they were alleged to have been responsible for were actions which, at the time and the setting in which they were taken, were actions which a responsible public official vested with their responsibilities could have thought was a proper way of effectuating the arrests of the members of the MOVE group.

The issue of immunity under state law is of a different nature. It does not focus on what some disembodied personage in the position of police commissioner or fire commissioner or city director might reasonably have thought was a reasonable way of carrying out his law enforcement and fire prevention responsibilities.

The issue under state law focuses on the actions of the individual person and what that person intended to accomplish. The basis for immunity under state law is a statute which I will read. It is not a model of clarity, but generally speaking statutes are not models of clarity. I will read it and then I will, in the course of·my subsequent discussion, try to explain my understanding of it.

I am reading from Section 8550 of Title 42 of the Pennsylvania Consolidated Statutes. This is a section of the Pennsylvania Tort Claims Act. It provides as follows:

In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

For our purposes I think it is fair to say that the question of immunity from liability focuses on the phrase "willful misconduct." If there is a basis on which it could be found properly under the evidence that one or another or all of these defendants engaged in "willful misconduct," then that official or those officials would not be immune from liability.

Now, when I addressed these issues before prior to the decision of the Court of Appeals back in January of 1994, I said:

With respect to the claims under state law, I conclude that Commissioners Sambor and Richmond are suable under the state law claims since they could be perceived as having engaged in "willful misconduct," to use the state statutory term. I do not say that that is in any sense a necessary reading of the record, but it is simply that that is a factual question which ultimately is to be addressed by a jury.

So, too, in view of my decision to address this record in its more broadly clarified status with respect to Managing Director Brooks, though Judge Hall would have dismissed him from liability on the state claims, I believe that he is not entitled to summary judgment with respect to the state claims.

849 F.Supp. 331, 347 (E.D.Pa.1994).

What the second paragraph that I quoted from myself refers to is this: Magistrate Judge Hall had concluded that Commissioner Sambor and Richmond were suable but that Managing Director Brooks was not, that there was no evidentiary basis for a finding of willful misconduct on his part.

I disagreed with Magistrate Judge Hall with respect to the situation of Managing Director Brooks and I did so because as the record was developed on the argument before me, reviewing the Report and Recommendation of Magistrate Judge Hall, it turned out in the course of resolving an ambiguity in the record that there was some basis, namely the recollection of Police Commissioner Sambor, for concluding that Managing Director Brooks had concurred, albeit very briefly, in a decision jointly taken by Police Commissioner Sambor and Fire Commissioner Richmond to let the fire, which had begun after the dropping of the bomb at 6221

Osage Avenue, burn until it consumed the bunker on the top of the MOVE home.

The recollection of Police Commissioner Sambor did not, I hasten to say, conform to Managing Director Brooks' recollection. It was his testimony that he, when he first saw any evidence of fire, directed that it be put out, that he never acquiesced in any burning at all.

At the summary judgment stage it was not within my province to resolve a conflict in the testimony since it was conceivable that a factfinder would conclude that Commissioner Sambor rather than General Brooks was right with respect to whether General Brooks had at any point acquiesced in letting the fire burn. And since, conceivably, the factfinder would also conclude that that was an excessive use of force to effectuate the arrests at that stage, I concluded that Managing Director Brooks was suable on the state law claims along with Commissioners Sambor and Richmond, suable that is to say in the sense of being a person who could not merely be brought into court but exposed to liability.

The case is now back here, but the question is whether these three individual defendants or any of them should be found to be immune from liability. Is there a ground on which I should now conclude that the determination that I made in January of 1994, two years ago, that these three defendants should be required to defend themselves at trial, should be reconsidered?

The question, as I say, is one of whether a factfinder could reasonably conclude that willful misconduct should be laid at the door of any one of these three defendants.

As I have explained, Judge Scirica, on the basis of his review of the case subsequent to my January 3, 1994 decision, expressed the conviction that there was no basis for attributing willful misconduct to any of the defendants.

And, as I have said, that opinion, while in no sense binding on me, is certainly one that warrants my decent respect and, by itself, justifies a request that I reexamine the record to determine whether the evidentiary record would indeed support a finding of willful misconduct against any of these three defendants.

I would point out that, though the question under state law is characterized as one of whether a defendant should be liable rather than whether a defendant should be suable, the issue of whether a defendant should be liable is an issue which under the law of Pennsylvania is to be—and I use the language of the statutory provision that I've already read from—"judicially determined." That is to say it is an issue for me, rather than for a jury.

The plaintiffs in this case take the position that there are factual issues which preclude a determination by me at this stage that any of these defendants is free from liability. Let me refer to the factual claims made by the plaintiffs in support of the proposition that there is an evidentiary basis for the conclusion that one or more of these defendants engaged in "willful misconduct."

I will refer, for convenience sake, to the principal brief filed on the plaintiffs' behalf, the brief of Ramona Africa. In arguing that Judge Scirica's views should not control mine, Mr. Dennis (Ms. Africa's attorney) says the following:

Judge Scirica fails to discuss three important facts in the present case that are evidence of willfulness. The first is a discussion between defendants Sambor and Richmond which resulted in their allowing the fire to continue to burn and constitutes evidence of a conscious and willful decision on their part.

The second is a conversation between defendants Sambor and Brooks, during which defendant Sambor advised Brooks that the fire was being allowed to burn to neutralize the so-called bunker and to which Brooks responded, "only the bunker." Again, this is evidence of a willful and conscious decision to allow the fire to burn.

Thirdly, there was a second conversation between defendants Sambor and Brooks during which defendant Brooks ordered Sambor to put the fire out. However, Sambor disregarded this order and allowed the fire to burn.

I have been reading from page 10 of Ms. Africa's brief.

The argument that I have just read is re-characterized, if you will, a few pages later in the Ramona Africa brief. On Page 15 the brief tells us that there are three "central factual issues to be decided," and they are listed as follows on page 16 and I quote:

One, whether Defendant Brooks knew or should have known it was improper to allow the fire to burn even for a short period of time.

Two, whether Defendant Richmond knew or should have known it was improper to acquiesce with Sambor and allow the fire to burn.

Three, whether Sambor knew or should have known it was improper to disregard a direct order from Managing Director Brooks to put the fire out when Sambor failed to follow Brooks' order.

What is willful misconduct? The law of willful misconduct in Pennsylvania has developed significantly and authoritatively since my January 1994 decision. In May of 1994 the Supreme Court of Pennsylvania decided *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289 (1994).

That was a case in which a Pittsburgh police officer had been found by a jury in a federal court to have engaged in assault and battery and false imprisonment in undertaking to make an arrest.

The police officer then brought a state court proceeding seeking indemnification by the City of Pittsburgh, his employer, for the amount that he had to pay in the federal lawsuit as a judgment.

The defense of the City of Pittsburgh was that Officer Renk's conduct was willful misconduct within the meaning of the statute that we have before us today. A finding of willful misconduct would excuse the City of Pittsburgh from indemnifying its employee.

The Commonwealth Court had found in favor of the City of Pittsburgh. The Supreme Court of Pennsylvania reversed. In a four-to-three decision the majority of the Court concluded that the verdict of the federal jury against Officer Renk did not by itself demonstrate that the wrongful conduct he had engaged in was willful misconduct. It was misconduct, yes, but whether it was willful misconduct was the decisive question and the majority concluded that the jury's verdict was ambiguous; it could not by itself prove that Officer Renk had engaged in willful misconduct.

Thus, the majority said:

It is conceivable that a jury could find a police officer liable for those torts under circumstances which demonstrate that the officer did not intentionally use unnecessary and excessive force, or did not deliberately arrest the person knowing that he lacked probable cause to do so. In this case, it is unclear whether the jury in the federal action determined that Renk intentionally used excessive force in arresting Laney, or only that he intentionally used force. Similarly, the jury's verdict does not resolve the issue of whether Renk intentionally arrested Laney knowing that he lacked probable cause to do so, or only that he lacked probable cause to make the arrest.

641 A.2d at 293–94.

In short, the standard that appears to have been adopted by the majority in *Renk* was a standard of willfulness that calls for intention to do what is known to be wrong, namely intention to use excessive force in making an arrest knowing that the force used is excessive, or intention to arrest and imprison somebody when the officer knows that he does not have probable cause to make the arrest in question.

The dissenting Justices make clear that in their view willful misconduct merely calls for misconduct that is carried out intentionally, but that willful misconduct does not require the ingredient of proof that the person engaged in the misconduct know that the conduct in question is misconduct.

For example, Justice Montemuro in his dissent from Justice Zappala's majority opinion says:

The majority today holds that, although appellant has previously been found liable for the torts of assault, battery, and false imprisonment, he may not have committed

willful misconduct and thus, is entitled to indemnification under section 8548. It bases this conclusion on the premise that appellant may not have intentionally committed these intentional torts. I am unable to join such a result. . . .

641 A.2d at 294.

In short, what is called for to demonstrate willful misconduct is not merely a showing of the use of excessive force to effectuate an arrest but a showing that the person who used excessive force not only intended to use that force but did so knowing that the force he was intentionally using was excessive and that he went ahead and used that excessive force anyhow.

It is argued by plaintiffs that it is not necessary for a person, in order to be stripped of immunity from liability, to be shown to have engaged in intentional misconduct, that is misconduct known to the perpetrator to be misconduct.

As I understand the last portion of the brief of Ms. Africa from which I have quoted, it is the position of the plaintiffs that it is sufficient if the defendant should have known that the conduct intentionally engaged in was wrongful conduct—that it is not necessary to show that the defendant actually knew and intended that the conduct employed was unlawful.

That is how I understand the argument which I have quoted which focuses the issues on page 16 of the Ramona Africa brief—whether Brooks knew or should have known, whether Richmond knew or should have known, whether Sambor knew or should have known. The framing of the issue that way is based on a case even more recent than the Renk case, the case relied on is Kuzel v. Krause, a decision of the Pennsylvania Commonwealth Court in this past year, May of 1995. The case is reported at 658 A.2d 856 (Pa.Commw.Ct.1995).

There is language in the Kuzel opinion that certainly supports Ms. Africa's argument. For example, at page 860, it is said: "Employees also had to establish that Commissioner Krause knew or should have known that it was improper to terminate

someone while receiving workmen's compensation and did so anyway."

There are two things to be said about the Kuzel formulation. The first is that Kuzel is not a case about police misconduct as ours is. I make that distinction because, in the course of its opinion in Renk, the Supreme Court of Pennsylvania distinguished an earlier opinion of the Commonwealth Court which was called King v. Breach, 115 Pa.Cmwlth. 355, 540 A.2d 976 (1988), on which the Commonwealth Court had itself relied in the Renk litigation, on the ground that, "The King decision, which did not involve police conduct, is of no precedential value." That was the observation of the Supreme Court of Pennsylvania at 641 A.2d at page 293.

That is to say Renk, like the case before us, is a case about police conduct in the sense that the total enterprise for which the plaintiffs seek to hold the Police Commissioner, the Fire Commissioner and the Managing Director accountable was a law enforcement enterprise to effectuate arrests.

Given that the Supreme Court of Pennsylvania distinguished King as being not a police case, I think it bears noting that the subsequent Commonwealth Court case, Kuzel, is not a police case.

But I should say more. The Kuzel opinion undertakes to build on Renk. The Kuzel court recognized that the Supreme Court of Pennsylvania had, in Renk, examined and rejected the Commonwealth Court's own prior analysis of the Tort Claims Act. So I think it is fair to regard Kuzel not as an attempt to develop further jurisprudence regarding the Tort Claims Act in a non-police setting. I think it is fair to say that in Kuzel the Commonwealth Court was undertaking to integrate Renk and its own jurisprudence into a unified understanding of immunity under the Tort Claims Act.

Having said that, I am of course saying that it is quite proper for the plaintiffs to rely on the language in Kuzel, including the "should have known" language, but I must then say that, with all respect, I think the Commonwealth Court misapprehended what the majority of the Pennsylvania Supreme Court decided in Renk.

I am quite clear that the Supreme Court of Pennsylvania, speaking through Justice Zappala, meant by "willful misconduct" misconduct which the perpetrator recognized was misconduct and which was carried out with the intention of achieving exactly that wrongful purpose.

If we measure the episodes relied on against that standard of willful misconduct, what do we find? Is there a basis in the three episodes relied on by the plaintiffs for a finding of willful misconduct?

We have Commissioner Sambor's testimony about the conversation which he and Commissioner Richmond had with respect to letting the fire burn. It enunciates the same time as 17:55 where:

I allegedly told the Fire Commissioner to let the bunker burn. And it was at that time that the Fire Commissioner and I were at the vicinity of 62nd and Osage that I asked the Fire Commissioner, "If we let the fire burn to get the bunker, could we control the fire?" He stated we could. And almost simultaneously we agreed, one or both of us, that it would be a good idea to put the water on either side of 6221 to prevent any spread of the flames.

A little bit later, and I'm now quoting from pages 74 and 75 of the testimony of Commissioner Sambor on October 18th, 1985:

I did not order the Fire Commissioner to do anything. I requested of him that if we let the roof burn to get the bunker, could we then subsequent to that control the fire.

And then a little further on:

Q. If we consider the word "tells" as something other than an order, is it accurate?

A. Yes, sir, it was a recommendation and a request. I wanted to get the bunker. I wanted to be able to somehow have tactical superiority without sacrificing any lives if it were at all possible and in that vein I asked him—I'm a police officer, not a firefighter—I asked him for his concurrence, that if we let the roof burn to get the bunker, could we then control the fire. And whatever the response was, it was in the affirmative.

Now, we have Commissioner Richmond's testimony of October 30, 1985, dealing with what is apparently the same conversation:

Q. Would you continue describing what you said to him and what he said to you?

A. I told him essentially that I thought we could contain the spread at that point. He said "Let's let the bunker burn to eliminate that high ground advantage and the tactical advantage of the bunker." And I said "Okay," I acquiesced, I agreed. It was not an order, it was not an absolute instruction. He made the recommendation, as you characterized it, sir, and I concurred.

Now, that tells us about the conversation between Commissioners Sambor and Richmond with respect to their joint decision to let the fire burn, in their stated view, until the bunker was consumed.

The testimony of Managing Director Brooks is to the following effect:

When I observed that there was fire on that roof, I immediately attempted to find the Police Commissioner. Upon finding him, I ordered the Police Commissioner that the objective had been accomplished, put out the fire. Then the Mayor called me after that, that's what I did do.

And Ms. Africa, questioning General Brooks, said:

Q. You're saying you ordered the Police Commissioner to put out the fire before you got a call from the Mayor?

A. Yes, that's been testimony repeated over and over again. What I said to the Mayor is "I've already given that order."

Q. Do you know at the point that you gave that order to put the fire out that the Police Commissioner, did you have any information at that point as to why the fire wasn't being put out?

A. Well, not until I got in touch with the Police Commissioner, no, because I was a long ways away.

Q. At the point you got in touch with the Police Commissioner did you receive any information as to why the fire was not being put out?

A. I don't recall the words, but the effect was "I want to burn the bunker off some more."

Then Mr. Waxman asked:

Q. When you say "I" are you referring to yourself?

A. No. The Police Commissioner said "I would like for the bunker to burn off some more." That was when I used the expression "You've already accomplished your mission, put out the fire."

Ms. Africa: So at that point you superseded the wishes of the Police Commissioner?

A. I gave him a direction to do that. If that is superseding, fine, if that's the word you want to use.

Q. You didn't feel like you had to contact the Mayor before?

A. Well, I didn't have time, I saw fire.

Q. So I take it that was something you considered a very, like serious?

A. Very, very.

Now, Commissioner Sambor's recollection is divergent in a significant respect from General Brooks. Here I quote from a letter written to me by Mr. Morris, John Morris, on December 29, 1993. Mr. Morris is Commissioner Sambor's attorney.

Mr. Sambor recalls two separate conversations with Mr. Brooks. In the first conversation, Brooks noted that he could see the fire on the roof and Sambor explained that they were letting the fire get the bunker. As stated in the deposition, Sambor says Brooks concurred, saying, "Only the bunker."

Brooks then called back a few minutes later and relayed the Mayor's order to put out the fire.

It is Mr. Morris' letter to me of December 29 which is the basis for what was referred to in my bench opinion of January 3, 1994. There I referred to a clarification which led me to take a view different from that of Magistrate Judge Hall on whether General Brooks should remain a defendant in the case. The clarification was the clarification I have just read of what Commissioner Sambor's recollection was.

Just as there is an evident difference of recollection between Commissioner Sambor and General Brooks, there is an apparent difference of recollection between Commissioner Sambor and Commissioner Richmond as to the communication of the Mayor's directive via General Brooks to put out the fire.

From Commissioner Sambor's October 18, 1985 testimony, the hour is 18:27.

Q. Do you know whether by that hour which is actually 6:27 in the evening whether or not there had been any order to put the fire out?

A. Yes, sir. To the best of my recollection the Managing Director sometime prior to that and sometime subsequent to our discussion—whether it was five minutes, ten minutes, I don't recall.

Q. According to that chronology that directive was given at 1800 hours on page 3.

A. That may well have been, sir.

Q. After that order was given to put the fire out and turn the water on, did you convey that order to anyone else?

A. Yes, sir.

Q. To whom?

A. The Fire Commissioner was still there.

Q. And once that order was given was it carried out?

A. There was water turned on, sir, and it was also turned off again and turned on again and turned off again because of conditions at the scene.

In his testimony of October 30, 1985, Commissioner Richmond was read some of the testimony that I've just read of Commissioner Sambor, concluding with the exchange:

Q. Did you convey that order to anyone else.

A. Yes, sir.

Q. To whom?

A. The Fire Commissioner was still there.

And then Commissioner Richmond asks:

Q. Those responses were Commissioner Sambor, sir?

A. Yes, sir.

A. I categorically deny that. I have no knowledge of an order from General Brooks to extinguish that fire.

Q. If you had known of that order by Commissioner Sambor what would you have done?

A. I would have had to make—

Q. Not Commissioner Sambor, by Mr. Brooks?

A. I would have had to make a decision and the decision would have been this: to, yes, turn the streams on and fight the fire or advise General Brooks of the concern I may have for personal safety of individuals on that ground. I would have, in any case I would have responded and then if I told him what my problem was and he still insisted, I certainly would have done it.

It is understood on this record, that is the joint testimony of the two Commissioners, that they agreed to let the fire burn and that they agreed to let the fire burn until the bunker was consumed and that was with a view to achieving what Commissioner Sambor characterized as a tactical advantage. Commissioner Richmond concurred in Commissioner Sambor's proposal because he, Commissioner Richmond, felt that the fire could be controlled.

Is there a basis in those conversations, taken by themselves, for attributing to either Commissioner Sambor or Commissioner Richmond willful misconduct, that is to say an intention to take action which either or both of them knew to be an excessive action in response to the law enforcement responsibilities which Commissioner Sambor had to arrest the members of the MOVE group?

I fail to find in the Sambor–Richmond conversation—characterized either in the Sambor testimony or the Richmond testimony—any basis for concluding that either Commissioner regarded the decision to let the fire burn until it consumed the bunker a decision to engage in what either man knew to be misconduct; it was just to be carried out anyhow.

Ms. Africa's brief emphasizes, however, that "[t]here was a second conversation between defendants Sambor and Brooks." The reference to a "second conversation" evidently treats as a *first* conversation a conversation which Sambor tells us of, though Brooks denies it, that Brooks acquiesced in the decision to let the fire burn up to getting the bunker. Ms. Africa's brief says:

> There was a second conversation between defendants Sambor and Brooks during which defendant Brooks ordered Sambor to put the fire out. However, Sambor disregarded this order and allowed the fire to burn.

The testimony ** from which I have quoted is open to the construction placed on it in Ms. Africa's brief that: "Defendant Brooks ordered Sambor to put the fire out. However, Sambor disregarded this order and allowed the fire to burn." I say it is open to that construction, but that is not a necessary construction.

It is Commissioner Sambor's testimony that he received an order from Managing Director Brooks, and that he transmitted it to the Fire Commissioner. And it is the Fire Commissioner's testimony: "I categorically deny that. I have no knowledge of an order from General Brooks to extinguish that fire."

I have no way of determining from what is before me whether Commissioner Sambor's recital is accurate; or Commissioner Richmond's recital is accurate; or whether conceivably both were giving testimony that they verily believed to be accurate and by some construction was accurate, but there were failures of communication; or whether there is some fourth explanation for the evident difference between the two Commissioners' statements.

I surely have no basis for concluding, as Ms. Africa's brief would have me do, that "Sambor disregarded this order and allowed the fire to burn." That is certainly a possible inference, but I have no way of knowing that it is a necessary inference.

---

** In using the word "testimony," I do not mean simply depositions in these proceedings. The word "testimony," for these purposes, more broadly includes the testimony of these Commissioners before the inquiry tribunal chaired by William Brown, III, which was established by Mayor Goode to inquire into the MOVE events.

On the basis of the materials before me it would be equally possible that Commissioner Richmond received an order, and was disingenuous in his testimony—i.e., that he received an order and disregarded the order. And perhaps, as I suggested, there are other explanations.

Let us assume for a moment that Commissioner Sambor did receive an order from General Brooks to put the fire out. And I'll put aside now the question whether General Brooks gave such an order the first moment that he saw flames or at a later point, having, as he denies he did, acquiesced in Commissioner Sambor's proposal to let the fire burn until it consumed the bunker.

Let us assume for the moment that Commissioner Sambor, as plaintiffs contend, received an order from the Managing Director and deliberately disregarded it. If a factfinder decided that that was a proper explanation of the scenario, it seems to me that a factfinder could look at a Police Commissioner's deliberate decision to disregard what his superior, the Managing Director, the Mayor's deputy, had told him to do as evidence that the high official who deliberately disregarded his superior's order was undertaking to do something that he—for the purpose of this assumption, the Police Commissioner—knew was a wrong thing to do.

I say that is a possible inference, that disobedience of General Brooks' order could be found by a factfinder as evidence that what the Commissioner did instead, namely letting the fire burn, was a wrong thing to do, was an excessive response to the law enforcement requirements.

At the same time I'll suggest that that is not a necessary inference, it is a permissible inference which a factfinder could pursue, but I suggest it is not a necessary inference. A factfinder, I suggest, could find that a Police Commissioner disregarded the direct order of a Managing Director because he, the Police Commissioner, felt that the Managing Director, while sincere, was woefully wrong in an emergency situation and misapprehended what would be the consequences of putting the fire out, what would be the consequences for the law enforcement process including such responsibilities as the

Police Commissioner had for securing the safety of his personnel.

I am not suggesting that I am wedded to one inference or the other, nor am I saying that those are the only permissible inferences that would follow from a finding that the Police Commissioner had deliberately disobeyed General Brooks' order. I'm only saying that at this stage we have testimony which it seems to me could lead to a view adverse to the Police Commissioner with respect to whether he knew what he was doing was wrong, but would not necessarily lead to that conclusion.

Having said that with respect to Commissioner Sambor, I would go on to say that, on the basis of the testimony which I have read, exactly the same analysis follows with respect to Commissioner Richmond.

If we, putting ourselves in the posture of factfinder, were to conclude that Commissioner Sambor did indeed forward General Brooks' order to Commissioner Richmond, and Commissioner Richmond, contrary to his testimony, received such an order and declined to carry it out, then under that scenario, I suggest that Commissioner Richmond's knowing disobedience of a directive which he knew originated with General Brooks and, beyond General Brooks, the Mayor, could be thought to have been some evidence that Commissioner Richmond had been following a course of action which he knew to be wrongful, and doing it nonetheless intentionally. Or, conceivably, he could be thought to have deliberately disobeyed an order and lied about the disobedience later, or disremembered it, for reasons that had to do with his good faith feeling that General Brooks, and the Mayor too, were pursuing a woefully wrong course and that the Commissioner's responsibilities—not for law enforcement so much (except as an adjunct to Commissioner Sambor) but to protect the city from an engulfing fire, and, at the same time, to protect his personnel—required him not to intervene at that point.

Once again I am not suggesting that any of the possible inferences that I am putting forward is necessarily the right one or that there are not alternative inferences, but I am

trying to identify that, first of all, the possibility of culpability with respect to disobeying an order does not necessarily focus only on Commissioner Sambor as the principal brief from which I have quoted would say; the testimony would equally implicate Commissioner Richmond instead of Commissioner Sambor as a disobeyer of orders.

And, secondly, it should be made clear that, in my judgment, a finding of deliberate disobedience of a superior's order does not in itself compel a finding of culpability for the purposes of this litigation. It may be evidence of culpability, of knowledge that what one was doing or deliberately not doing was wrongful, but it does not compel that conclusion without more.

In particular, I would make the point that what is at issue in this lawsuit is not whether an official disobeyed orders but whether an official engaged in willful misconduct. Disobedience of an order may be evidence of willful misconduct but it is not synonymous with willful misconduct.

I have reviewed the testimony as it relates to the two Commissioners at considerable length—that is to say the testimony and what inferences it seems to me might be drawn from that testimony—with a view to showing that at this stage I do not see that it is possible to make a ruling of finality that there has not been willful misconduct because it seems to me conceivable—I don't say probable, but conceivable—that the testimony now available would be consistent with a finding of willful misconduct on the part of one or conceivably (though that seems to me less probable on the present state of the record) both of the Commissioners.

So at this stage I cannot in my judgment responsibly grant the motions for summary judgment in favor of either Commissioner Sambor or Commissioner Richmond.

Whether either of them has any liability is a matter which, in my judgment, must await a trial at which the record which I have canvassed this afternoon may be amplified or the testimony that I have discussed may be placed in a more informing context such that I will then be in a position to make a determination with respect to both Commissioner Sambor and Commissioner Richmond on the issue of liability.

■ With respect to General Brooks, I see two scenarios: one is General Brooks' own testimony that as soon as he saw evidence of fire he directed that it be put out. Second, I see Commissioner Sambor's recollection that there was an understanding reached by him with General Brooks that the fire could be allowed to continue to burn until it consumed the bunker.

Only that second scenario would implicate General Brooks at all in the decision to let the fire burn. If we assume that that second scenario is the accurate one, and that on this point Commissioner Sambor's recollection is better than General Brooks' recollection as to what General Brooks said, I cannot find any basis for reading into General Brooks' assumed acquiescence in Commissioner Sambor's plan to let the fire burn until it consumed the bunker any basis for attributing to General Brooks willful misconduct.

At the outside, it shows General Brooks saying, "only the bunker," so that although that may have been a misjudgment on General Brooks' part to think that the fire could be stopped at the bunker, acquiescence in a limited plan whose limits General Brooks defined as "only the bunker" cannot, so it seems to me, be a basis for a finding of willful misconduct.

And so I am of the view that General Brooks must be dismissed as a party defendant in the upcoming trial of the state law claims while Commissioners Sambor and Richmond should be retained as defendants in that trial.

In short, I will grant General Brooks' motion for summary judgment in his favor and deny the motions of Commissioners Sambor and Richmond.

It remains to reemphasize two points: the determination at trial of whether the actions or failures to act and declining to act of Commissioner Sambor and/or Commissioner Richmond can be characterized as "willful misconduct," thereby subjecting either of those defendants to potential liability, is a determination, although made pursuant to the trial, which will be made by the judge.

As I have said, it is a "judicial determination" under the law of the Commonwealth.

The second point I think apparent from my discussion of the recent cases construing "willful misconduct" as understood by the highest courts of Pennsylvania is that willful misconduct, under the law of Pennsylvania, is an exceedingly demanding standard.

In permitting the plaintiffs to try to make their case against Commissioners Sambor and Richmond, I am saying that the plaintiffs are entitled to make the attempt to meet that standard; I am saying nothing more.

Accordingly, I will enter a written order which, pursuant to this bench opinion, will grant summary judgment in favor of defendant Brooks and against the plaintiffs and will deny summary judgment as to defendants Sambor and Richmond.