In re CITY OF PHILADELPHIA
LITIGATION.

Ramona AFRICA

v.

CITY OF PHILADELPHIA, et al.

Louise JAMES, Administratrix of
the Estate of Frank James

v.

CITY OF PHILADELPHIA, et al.

Alfonso LEAPHART, Administrator of
the Estate of Vincent Leaphart

v.

CITY OF PHILADELPHIA, et al.

Master File No. 85–2745.
Civ. A. Nos. 87–2678, 85–3528 and 87–2756.

United States District Court,
E.D. Pennsylvania.

Aug. 27, 1996.

Steven R. Waxman, R. James Kravitz, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, for Leo A. Brooks.

Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, John W. Morris, Philadelphia, PA, for Gregore Sambor.

Stephen J. Imbriglia, Hecker, Brown, Sherry and Johnson, Philadelphia, PA, Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, Peter C. Kennedy, Hecker, Brown, Sherry and Johnson, Philadelphia, PA, for William Richmond.

Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, for Frank Powell, Lt.

John R. O'Donnell, Zarwin & Baum, P.C., Philadelphia, PA, Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, for William Klein.

Laura Fredricks, Deputy Attorney General, Philadelphia, PA, Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, John O.J. Shellenberger, III, Office of Attorney General, Philadelphia, PA, for Morris Demsko, Richard Reed.

Fincourt B. Shelton, Darby, PA, for Louise James.

Rosemarie Rhodes, Harper & Paul, Philadelphia, PA, for Alfonso Leaphart.

OPINION

LOUIS H. POLLAK, Senior District Judge.

May 13, 1985 was a day of tragedy in Philadelphia. That day marked the catastrophic culmination of a stand-off between the law enforcement authorities of the City of Philadelphia and the members of a group called "MOVE" who resided in a row house at 6221 Osage Avenue in the western part of Philadelphia.

The principal events of May 13 were these: Early in the morning, Police Commissioner Gregore Sambor, speaking through a bull-

Andre L. Dennis, Stradley, Ronon, Stevens & Young, LLP, Philadelphia, PA, for Ramona Africa.

Ramona Africa, Philadelphia, PA, pro se.

Arlene F. Bell, City of Philadelphia, Law Department, Philadelphia, PA, Debra M. Russo, Philadelphia, PA, E. Jane Hix, City of Philadelphia, Law Dept., Philadelphia, PA, for City of Philadelphia.

Arlene F. Bell, City of Philadelphia, Law Dept., Philadelphia, PA, Debra M. Russo, Philadelphia, PA, for Willie Goode.

horn outside 6221 Osage Avenue, announced that the police had arrest warrants for four named MOVE members and directed that those inside the house come out. That directive was not complied with. Subsequently, there was massive police gunfire directed at 6221 Osage Avenue. According to the police, there was also gunfire directed at the police from the MOVE house, some of the gunfire coming from a wooden bunker on the roof. When the gunfire subsided, police officers entered the houses immediately adjacent to 6221 Osage Avenue and attempted to make holes through the common walls with a view to injecting tear gas into the MOVE house so that the MOVE residents would come out. The efforts to make holes in the walls (efforts involving the use of "shaped" explosive charges) were unsuccessful. In the late afternoon, a police helicopter dropped an explosive device on the roof of 6221 Osage Avenue. According to the police, the purposes of this act were two-fold: first, to create a hole in the roof through which tear gas could be injected, and, second, to disable the roof-top bunker which, as a site for possible further gunfire from the MOVE house, was perceived as a threat to police and others in the 6200 block of Osage Avenue and neighboring areas. Not long after the explosive device was dropped, the roof of 6221 Osage Avenue caught fire. The fire consumed the MOVE residence and eleven of the thirteen persons inside died; among the dead were five children. The fire spread to, and consumed in whole or in part, scores of neighboring buildings, but there were no other fatalities.

The disaster devastated the West Philadelphia community, numbed the whole city, and stunned the entire nation. It was also the catalyst of scores of lawsuits brought in, or removed to, this court. Of those lawsuits, all but three settled.[1] The three remaining lawsuits were consolidated for trial.

One of these lawsuits has been brought by Ramona Africa, a MOVE member who was one of the four occupants of 6221 Osage Avenue for whom the police had arrest warrants. Ms. Africa was one of two occupants (the other was a teenage boy) who managed to survive the fire and to emerge alive, at which point they were taken into police custody. The other two lawsuits have been brought by (1) Alfonso Leaphart as administrator of the estate of his brother John Africa (whose pre-MOVE name was Vincent Leaphart), and (2) Louise James Africa as administratrix of the estate of her son Frank Africa (whose pre-MOVE name was Frank James); both John Africa (the founder of MOVE) and Frank Africa (who, like Ramona Africa, was one of the four occupants of the MOVE house for whom the police had arrest warrants) died in the fire. In all three lawsuits, federal jurisdiction attached by virtue of federal claims under 42 U.S.C. § 1983; to the federal claims were annexed so-called "supplemental," 28 U.S.C. § 1367,[2] state law claims.

Each of the plaintiffs brought a section 1983 claim against the City of Philadelphia. These claims have alleged, in substance, that the City, through its officials, in the course of efforts to apprehend and arrest certain MOVE members, (1) dropped an explosive device on the MOVE house at 6221 Osage Avenue and then, (2) pursuant to a tactical decision taken by Police Commissioner Gregore Sambor and Fire Commissioner William Richmond, for a period of time deliberately refrained from taking effective steps to extinguish the ensuing fire. This course of action, so the three plaintiffs contended, was in excess of appropriate law enforcement methods and therefore constituted, in each of the three instances, an "unreasonable seizure" within the meaning of the Fourth Amendment. Ramona Africa has claimed that the fire caused her severe physical and emotional injuries. The estates of John Africa and Frank Africa have alleged that the fire caused the deaths of the decedents.

---

1. Guiding the settlement process was but one aspect of the many-faceted and years-long pretrial process presided over, with consummate skill, by (now-retired) Magistrate Judge William F. Hall, Jr.

2. At the inception of this litigation, which antedated the 1990 enactment of 28 U.S.C. § 1367, the applicable terminology was "pendent," not "supplemental."

The supplemental state law claims of Ms. Africa and the estates of John Africa and Frank Africa have focused on the alleged deliberate decision of Commissioners Sambor and Richmond—the two individual defendants, who are, in the terminology of 28 U.S.C. § 1367, "additional parties"—to delay, for a period of time, commencing effective efforts to fight the fire. It has been the contention of the plaintiffs that the implementation of this decision—resulting in injuries to Ramona Africa and the deaths of John Africa and Frank Africa—constituted, in each instance, a "battery" under the laws of the Commonwealth of Pennsylvania. In pursuing their supplemental state law claims of battery, Ramona Africa and the estate of Frank Africa have named both Commissioner Sambor and Commissioner Richmond as defendants. In pursuing its supplemental state law claim of battery, the estate of John Africa has named only Commissioner Richmond as a defendant.[3]

Trial in these consolidated lawsuits commenced in late April of 1996 and took approximately two months. On June 24th the jury returned its verdicts. The jury found the City of Philadelphia liable to each of the plaintiffs pursuant to the section 1983 claims. The jury also found in favor of the plaintiffs on the state law claims: *i.e.*, Commissioners Sambor and Richmond were found liable both to Ramona Africa and to the estate of Frank Africa; and Commissioner Richmond (the only defendant in the state law claim of the estate of John Africa) was also found liable to the estate of John Africa.

Compensatory damages having been sought by all three plaintiffs both under the section 1983 claims and under the state law claims, the jury awarded $500,000 to each of the plaintiffs; the jury was not asked to, and did not undertake to, apportion these awards

among the three defendants. Punitive damages having been sought under the state law claims against Commissioners Sambor and Richmond, the jury fashioned identical punitive damages awards against each of the two defendants; the awards were in the sum of one dollar ($1.00) per week for eleven years to each plaintiff in whose favor judgment would be entered.

Now before the court are three issues:

The first issue, which arises in the context of the section 1983 claims against the City of Philadelphia, is whether, notwithstanding the jury's verdicts, the City is entitled to judgment as a matter of law in its favor and against all three plaintiffs.

The second issue, which arises in the context of the state law claims against Commissioners Sambor and Richmond, is whether, notwithstanding the jury's verdicts, either of these two defendants is entitled to a determination by this court that he is, as a matter of state law, entitled to official immunity from liability to any of the three plaintiffs.

The third issue is whether the plaintiffs are entitled to "delay damages" in addition to the damages awarded by the jury.

## I.

On June 7, 1996, the City of Philadelphia moved for judgment as a matter of law on the section 1983 claims. At a subsequent conference on the record with counsel, this motion was denied. Following the jury verdicts in favor of all three plaintiffs and against the City on the section 1983 claims, the City renewed its motion for judgment as a matter of law.

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against

---

3. When these lawsuits began, several entities in addition to the City of Philadelphia and persons in addition to Commissioners Sambor and Richmond were named as parties defendant both under plaintiffs' federal claims and under plaintiffs' state law claims. However, for a variety of reasons, the claims against those other defendants were dismissed prior to trial. For more extended descriptions and analyses of the pretrial phases of this extended litigation, see (1) *Africa v. City of Philadelphia*, 809 F.Supp. 375 (E.D.Pa.1992); (2) *In re City of Philadelphia Litigation*, 849 F.Supp. 331 (E.D.Pa.1994), *rev'd in part, aff'd in part, in part dismissed for lack of jurisdiction*, by (3) *In re City of Philadelphia Litigation*, 49 F.3d 945 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995); (4) *In re City of Philadelphia Litigation*, 938 F.Supp. 1264 (E.D.Pa.1996); and (5) *In re City of Philadelphia Litigation*, No. 85–2745, 1996 WL 84737 (E.D.Pa. Feb. 22, 1996).

unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In bringing their excessive force claims, plaintiffs asserted that dropping the bomb and letting the fire burn amounted to "unreasonable ... seizures" of Ramona Africa, of Frank Africa, and of John Africa. In order to prove their respective section 1983 claims, it was incumbent on plaintiffs to show (1) that there were "seizures" within the meaning of the Fourth Amendment, and (2) that the seizures were, within the meaning of the Amendment, "unreasonable." *See Brower v. County of Inyo,* 489 U.S. 593, 599, 109 S.Ct. 1378, 1382–83, 103 L.Ed.2d 628 (1989) (" 'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.' ").

In its motion, the City contends that judgment must be entered in its favor because the evidence at trial demonstrated that no Fourth Amendment "seizure" occurred. In ruling on this motion, the court must apply the same standard applicable to a motion for summary judgment. That is, the motion must be denied unless, viewing the evidence in the light most favorable to the plaintiffs, no reasonable jury could have found liability on the part of the City. *See Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993).

The City argues that none of the plaintiffs was "seized" because the explosive device and the subsequent fire were not instrumentalities employed to effectuate a "seizure." As the City puts it, in its memorandum submitted in support of its motion for judgment as a matter of law, no seizure occurred because "neither the explosive device nor the fire were intentionally applied by the police against the Plaintiffs as a means of stopping them, nor were they designed to make the Plaintiffs choose between capture or death by fire." City Memorandum at 7. The City also argues that, even if Ramona Africa and Frank Africa can be said to have been "seized," John Africa was not "seized" because, unlike Ramona Africa and Frank Africa, John Africa was not the subject of an

arrest warrant and therefore was not a target of the police activities of May 13, 1985. According to the City, "a 'seizure' under the Fourth Amendment may be found only if the plaintiff was the intended object of police pursuit or force." *Id.* at 4. Because, viewed in the light of the evidence presented at trial, neither of these arguments comports with governing Fourth Amendment jurisprudence, the City's motion will be denied.

## A. Whether the Explosive Device and the Subsequent Fire Were "Means Intentionally Applied" by the City in Order to Effectuate a "Seizure"

▮ In *Brower v. County of Inyo,* 489 U.S. 593, 597, 109 S.Ct. 1378, 1381–82, 103 L.Ed.2d 628 (1989), the Supreme Court stated that a "seizure," within the meaning of the Fourth Amendment, occurs "when there is a governmental termination of freedom of movement *through means intentionally applied* " (emphasis in original). *Brower* arose following a high-speed chase in which the crime suspect was killed by crashing into a police roadblock. The suspect's estate brought a claim against the police officers, alleging that the use of the roadblock was unreasonable and violated the Fourth Amendment. The Supreme Court held that a seizure occurred if the roadblock was intentionally applied in order to bring the suspect into custody. In so holding, the Court stated:

Nor do we think it possible, in determining whether there has been a seizure in a case such as this, to distinguish between a roadblock that is designed to give the oncoming driver the option of a voluntary stop (*e.g.,* one at the end of a long straightaway), and a roadblock that is designed precisely to produce a collision (*e.g.,* one located just around a bend). In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the

very *instrumentality set in motion or put in place in order to achieve that result.*

489 U.S. at 598–99, 109 S.Ct. at 1382.

Citing *Brower,* the City argues that no seizure can be found in the present cases because the explosive device and the subsequent fire were not employed with the immediate goal of capturing Ramona Africa, Frank Africa and John Africa. Rather, the explosive device was used in order to disable the rooftop bunker and to create holes in the roof into which tear gas could be dropped. The City further argues that, to the extent that the plaintiffs presented evidence that City officials intentionally allowed the fire to burn, the evidence suggested that the fire was allowed to burn only to disable the bunker. While disabling the bunker and creating holes in the roof may have been acts which were part of a plan whose ultimate goal was to seize certain persons inside the MOVE house, those acts are said to have been too far removed from the goal of seizure to amount to "instrumentalit[ies] set in motion or put in place to achieve that result."

The City's argument is not persuasive. Indeed, the substance of the argument has already been rejected by the Court of Appeals. *See In re City of Philadelphia Litigation,* 49 F.3d 945 (3d Cir.1995). One of the rulings of this court that the Court of Appeals had occasion to address prior to trial was the denial of the City's motion for summary judgment on the section 1983 claim. Judge Greenberg agreed with the City's position that no seizure had occurred:

> The destruction of the bunker was obviously a part of the officials' day-long effort to seize the MOVE members, but none of the officials intended it in itself to effectuate the seizure. Nor could they reasonably have intended the destruction of the bunker alone to be conclusive in any way, even though it may well have been reasonable to believe, as they did believe, that its destruction was an important objective.

49 F.3d at 963 (Opinion of Greenberg, J.). But Judges Scirica and Lewis—each of whom filed a separate opinion—disagreed with Judge Greenberg on this point. Judge Scirica wrote:

> I believe there was a seizure under the Fourth Amendment. The Osage Avenue house was occupied by the subjects of the arrest warrant and the officials used force with the aim of gaining entry into the house or forcing the occupants out. The incendiary device was "the very instrumentality set in motion or put in place in order to achieve that result." *Brower v. County of Inyo,* 489 U.S. 593, 599 [109 S.Ct. 1378, 1382–83, 103 L.Ed.2d 628] (1989). In *Brower,* the Court noted that a Fourth Amendment seizure does not occur when the effect of seizure is purely fortuitous.... Thus, our inquiry is not whether the officials intended all the consequences of their use of the incendiary device, but whether they intended to use force to arrest these individuals. I conclude that they did, and because the MOVE members were harmed by the fire caused by the incendiary device, "the very instrumentality set in motion or put in place in order to" arrest the occupants of the house, I find a Fourth Amendment seizure.

49 F.3d at 974 (Opinion of Scirica, J.). And Judge Lewis wrote:

> I also agree with Judge Scirica, for the reasons stated in his concurring and dissenting opinion, that the police effected a Fourth Amendment seizure in this case.

49 F.3d at 976 (Opinion of Lewis, J.).

In reliance on the expressed views of Judges Scirica and Lewis, plaintiffs, in submitting proposed points for charge, argued that I should instruct the jury *as a matter of law* that Ramona Africa, Frank Africa and John Africa had been "seized" within the meaning of the Fourth Amendment. But I did not agree. In my view, the issue the Court of Appeals had addressed, in the excerpts quoted above, was whether this court had erred in *denying* summary judgment in favor of the defendant City of Philadelphia, not whether partial summary judgment (i.e., summary judgment on the issue of seizure) should have been *granted* in favor of the plaintiffs. To be sure, Judge Scirica stated, "I find a Fourth Amendment seizure," and

Judge Lewis agreed that "the police effected a Fourth Amendment seizure." But I was of the view (and I remain of the view) that the statements of Judges Scirica and Lewis (and, likewise, the disagreeing statement of Judge Greenberg) must be understood as conclusions of law deriving from a set of alleged facts which, for purposes of reviewing a denial of summary judgment, the Court of Appeals took to be undisputed. As a result, the opinions of Judges Scirica and Lewis signify that, in their joint view, a jury could reasonably find a seizure on the facts as the Third Circuit understood them. In short, I understand Judges Scirica and Lewis as having held, on the basis of the appellate record, that *if* a jury found that City officials, for the purpose of apprehending persons inside the Osage Avenue house, had employed an explosive device that triggered a fire, and that the fire had harmed persons inside the house, then the jury *could* conclude that persons harmed by this course of conduct had been "seized." The evidence presented at trial did not significantly deviate from the version of the facts that the Court of Appeals took as given in addressing the seizure issue. Thus, evidence was presented that would support a finding that City officials dropped the explosive device and then allowed the fire to burn, in Judge Scirica's words, "with the aim of gaining entry into the house or forcing the occupants out." 49 F.3d at 974. Since two members of the Court of Appeals panel held that the use of the explosive device and fire for these purposes could support a finding that a seizure occurred, that holding binds this court. Thus, the City's contention that this court must conclude, as a matter of law, that no seizures occurred, must be rejected.

**B. Whether John Africa Was "Seized" Even Though He Was Not the Subject of an Arrest Warrant**

■ The City also advances the more limited argument that, even if Ramona Africa and Frank Africa can be said to have been "seized," John Africa was not "seized" because, unlike Ramona Africa and Frank Africa, John Africa was not the subject of an

arrest warrant and hence was not a person the police intended to apprehend.

The City is correct in contending that intentionality is a key ingredient of a Fourth Amendment seizure. "Violation of the Fourth Amendment," said the Court in *Brower*, "requires an intentional acquisition of physical control." 489 U.S. at 596, 109 S.Ct. at 1381. And, shortly after the decision in *Brower*, the First Circuit held that a police officer who, aiming at a fleeing suspect, accidentally shot the suspect's hostage, could not be found to have "seized" the hostage in contravention of the Fourth Amendment. *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791, 797 (1st Cir.1990). Similarly, the Fourth Circuit held that a bystander accidentally shot by a police officer aiming at the tires of the car in which a suspect was fleeing had no cognizable Fourth Amendment claim against the officer. *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir.1991). Both the First and Fourth Circuits found dispositive *Brower*'s insistence on intentionality. As the Fourth Circuit put it, *Brower* "means that a fourth amendment seizure may occur notwithstanding that the person restrained was mistakenly thought to be another, because he nevertheless is the intended object of the specific act of physical restraint. But it does not mean … that a seizure occurs just so long as the act of restraint itself is intended (here the act of shooting) though it restrains one not intended to be restrained." *Rucker*, 946 F.2d at 281.[4]

Assuming, as I do, that *Rucker* and *Landol–Rivera* are proper explications of *Brower*, they do not support the City's argument that the jury could not properly find that John Africa was an intended object of the measures pursued by the Philadelphia police on May 13, 1985, and, hence, that the harm which befell him was a "seizure" within the meaning of the Fourth Amendment.

The difficulty with the City's argument is not its legal underpinning. The difficulty with the City's argument is that it does not take adequate account of the evidentiary rec-

---

4. *See also Ansley v. Heinrich*, 925 F.2d 1339, 1344 (11th Cir.1991); *but cf. Roach v. City of* *Fredericktown*, 882 F.2d 294, 297 (8th Cir.1989).

ord before the jury. That record provides an ample basis for a jury finding that the City's May 13 efforts, under the field command of Commissioner Sambor, while primarily centering on the arrest of the four persons named in the arrest warrants, had the broader purpose of requiring all those inside 6221 Osage Avenue to come out. Supportive of such a jury finding are the words spoken by Commissioner Sambor over the bullhorn at approximately 5:35 a.m. on May 13:

> This is the Police Commissioner, we have warrants for the arrest of Frank James Africa, Ramona Johnson Africa, Theresa Brooks Africa, and Conrad Hampton Africa for various violations of the criminal statutes of Pennsylvania. We do not wish to harm anyone, all occupants have 15 minutes to peaceably evacuate the premises and surrender. This is your only notice, the 15 minutes starts now.

Plaintiff Ramona Africa Exh. 1.

It should be noted that the use of the term "all occupants" (in the sentence "We do not wish to harm anyone, all occupants have 15 minutes to peaceably evacuate the premises and surrender") was advertent. According to Commissioner Sambor, the term "all occupants" was substituted for "you" at a meeting with Managing Director Brooks on the evening of May 12, some hours prior to the Commissioner's early morning bullhorn announcement. The pertinent testimony of Commissioner Sambor is as follows:

> A. In the beginning, I had written this is police commissioner and I had "the" written above it. And I had my name, Sambor. And down further, we do not wish to harm anyone, you have 15 minutes. I changed that to read "all occupants" from just the word you.

> Q. Commissioner Sambor, is it fair to state that as you had initially prepared it, this announcement was directing four people—to come out of the house?

> A. Are you speaking about I had no intention about as to whether it meant four people or all people, I just used the word you and it was Leo Brooks that suggested that this was not as pertinent as it could be.

> Q. When you drafted it and before you made the changes that General Brooks suggested, in your mind, how many people were you asking or ordering to come out of the house?

> A. I don't recall having any specific number in mind, but I did mention four people.

> Q. Well, as you had originally drafted it, is it your testimony that if four people had come out, that would have satisfied you?

> A. No, sir.

> Q. Is it fair to state that as you originally drafted it, even though it said you and not all occupants, you still expected everyone to come out of the house?

> A. At that time, I can't—I can't tell you now specifically what I had in mind, but I did expect all occupants to come out of the house.

> Q. Well, what I'm trying to determine, if you can help me a bit on this, is whether you—as you originally drafted it—intended to order all of the occupants to come out of the house?

> A. I can only reiterate what I just said. I cannot recall at this moment specifically whether I meant you in a singular or four person context or all occupants of the house.

> Q. Can we agree that if the word you had remained, it could have been interpreted to mean just four people come out?

> A. It could have, yes, sir.

> Q. And by including the words all occupants instead of you, it is more likely that it would be taken to mean that everyone was to come out?

> A. Yes, sir.

> Q. Now, you only had warrant [sic] for four people?

> A. That is correct, sir.

> Q. And when you read this announcement, you did not read or make reference to a search warrant, is that correct?

> A. I did not.

> Q. So, is it fair to state that when you ordered all of the people to come out, you were ordering more people to come out than you had warrants to serve upon?

A. ʾ That is not quite correct, sir. That is more people than I had body warrants for, but the search warrant—

Q. Body warrants, because you had not announced the search warrant?

A. No, sir.

Q. So, that the people inside the house would not know about the search warrant?

A. That is correct.

Q. So, what they would hear is four names mentioned and then an order that all of them come out of the house, correct?

A. Yes, sir.

Transcript of Testimony, April 25, 1996, at 8–10.[5]

In seeking to achieve their goal of "gaining entry into the house or forcing the occupants out," *In re City of Philadelphia Litigation,* 49 F.3d at 974, City officials selected instruments (an explosive device, followed by a fire), which would by their very nature affect all occupants of the house equally. Indeed, as Commissioner Sambor explained in his early morning bullhorn announcement to those inside the MOVE house, *"all occupants* have 15 minutes to peaceably evacuate the premises *and surrender"* (emphasis added). City officials were also aware that MOVE founder John Africa was probably present in the house: Commissioner Sambor testified that, as of the time he spoke on the bullhorn, he believed that John Africa was one of the persons inside 6221 Osage.[6] Transcript of Testimony, April 26, 1996, at 50. In sum, then, the jury could have reasonably deter-

mined that John Africa was one of the occupants of the MOVE house seized as a result of the conduct of officials of the City of Philadelphia.

**C. The City's Motion for Judgment as a Matter of Law Will Be Denied**

Accordingly, for the reasons given in Parts I(A) and I(B) of this opinion, the motion of the City for judgment as a matter of law with respect to the plaintiffs' section 1983 claims will be denied.

**II.**

■ The issue next to be addressed is one of state law, and it relates to the supplemental state law claims against Commissioners Sambor and Richmond. As described in the introductory portion of this opinion, the jury found in the plaintiffs' favor on their respective claims of battery: all three plaintiffs sued, and recovered verdicts against, Commissioner Richmond; two of the plaintiffs— Ramona Africa and the estate of Frank Africa—sued, and recovered verdicts against, Commissioner Sambor. In arguing that the jury verdicts are not sufficient to establish liability, Commissioners Sambor and Richmond contend that the plaintiffs' state law claims must be dismissed for the reason that the batteries found by the jury have not been "judicially determined" to constitute "willful misconduct," 42 Pa.C.S.A. § 8550, and hence that the two individual defendants are, as a matter of state law, immune from liability.

---

**5.** As to the police intention to search 6221 Osage Avenue, pursuant to the search warrant, see *id.* at 10–11 and Transcript of Testimony, April 26, 1996, at 71.

**6.** In its salient aspects, John Africa's situation was crucially unlike that of the hostage shot by the police in *Landol–Rivera,* or that of the bystander shot by the police in *Rucker.* A trained police officer who fires a gun has some ability to discriminate between targets. Thus, in both *Landol–Rivera* and *Rucker,* the most that could be said is that the police were negligent or reckless in firing in proximity to an innocent person. *Cf. Landol–Rivera,* 906 F.2d at 797 (stating, in discussing a due process claim, that "[a]t best, Landol can argue that [the police officer] acted negligently in firing in a manner that could have caused injury to the occupants of the car...."). As the Court observed in *Brower,* "the Fourth

Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." *Brower,* 489 U.S. at 596, 109 S.Ct. at 1381 (citation omitted).

By contrast with the forceful methods employed by the police in *Landol–Rivera* and *Rucker,* the forceful methods employed in the present case were incapable of discriminating between the four persons sought to be arrested and all of the other persons believed by the City to be present in, and actually present in, the MOVE house, including John Africa. Thus, John Africa's inclusion in the group of persons affected by the City's conduct cannot be said to have been "accidental." It is as though the police in *Brower* had known that the crime suspect in that case had an innocent passenger in his vehicle, but nevertheless constructed the fatal roadblock: the passenger would have been seized by the police conduct just as the driver was.

The issue arises in the context of the Pennsylvania statutory scheme, established by the Political Subdivision Tort Claims Act, which defines the scope of the liability of a local governmental entity, or of an employee of a local governmental entity, for damages "on account of any injury to a person." 42 Pa.C.S.A. §§ 8541 *et seq.* In general, the liability of a local governmental entity for personal injury is confined, pursuant to definitions set forth in section 8542(b) of the statute, to situations involving injuries arising from the operation or management of motor vehicles, streets, sidewalks, traffic control systems, utilities, realty, personalty, or animals, which are possessed or controlled by the municipality.[7] *Id.* at § 8542(b). Also, as a general matter, a municipal employee sued for damages for injuries to a person resulting from acts "within the scope of [the employee's] office or duties" (1) is liable for damages "only to the same extent as his employing local agency," *id.* at § 8545; (2) can assert certain defenses of "official immunity," *id.* at § 8546; (3) is entitled to be indemnified by his employing agency for any adverse judgment, *id.* at § 8548; and (4) is protected by a statutory ceiling on damages, *id.* at § 8553.

■ If this were the entirety of the statutory scheme, defendants Sambor and Richmond would be wholly insulated from liability, for the reason that (1) the batteries charged against them—and found by the jury—do not fall within any of the very limited categories of municipal liability listed in section 8542(b), and (2), as already noted, the scope of liability of an individual municipal employee for acts performed in the course of employment is, by virtue of section 8545, coextensive with—and hence no greater than—the scope of liability of the employing municipal entity as described in section 8542(b). There is, however, a further statutory provision which, in the case of particularly egregious conduct, deprives a municipal employee of the protection contemplated by section 8545 and the other protective provisions of the statute. That further statutory provision is section 8550, which provides as follows:

### § 8550. Willful misconduct

In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

Thus, in seeking to impose liability on Commissioners Sambor and Richmond for the batteries found by the jury to have been committed by them, the plaintiffs contend that the evidence establishes, both as to defendant Sambor and as to defendant Richmond, "willful misconduct."[8] Defendants

---

7. Encumbering this opinion with the entire extended text of section 8542(b) would not seem useful. The Commonwealth Court has compendiously summarized that text in *City of Philadelphia v. Glim,* 149 Pa.Cmwlth. 491, 613 A.2d 613, 617 n. 5 (1992):

The governmental immunity exceptions set forth in 42 Pa.C.S. § 8542(b) cover the following eight topics: the operation of any motor vehicle in the possession or control of the local agency; the care, custody or control of personal property of others in the possession or control of the local agency; the care, custody or control of real property in the possession of the local agency; a dangerous condition of trees, traffic signs, lights or other traffic controls, street lights or street lighting systems under the care, custody or control of the local agency; a dangerous condition of the facilities of steam, sewer, water, gas or electric systems owned by the local agency and located within

rights-of-way; a dangerous condition of streets owned by the local agency or of streets owned or under the jurisdiction of a Commonwealth agency if the local agency has a written maintenance and repair contract with the Commonwealth agency; a dangerous condition of sidewalks within the rights-of-way of streets owned by the local agency, and the care, custody or control of animals in the possession or control of a local agency.

8. In the alternative—and, indeed, as an antecedent argument obviating consideration of the contention that defendants Sambor and Richmond are guilty of "willful misconduct"—plaintiff Ramona Africa also contends that the jury's verdict in her favor makes it unnecessary for her (and, parity of reasoning suggests, for her co-plaintiffs) to establish that the torts of defendants Sambor and Richmond constituted "willful misconduct." Ms. Africa argues:

Sambor and Richmond contend to the contrary.

In a bench opinion of January 18, 1996, some three months prior to the trial of this case, I denied summary judgment motions submitted by Commissioner Sambor and Commissioner Richmond in which the Commissioners contended that there was no evidence on the basis of which a factfinder could conclude that they had engaged in "willful misconduct" in letting the fire burn for a period of time, the gravamen of the plaintiffs' state law claims. I concluded that there were material issues of fact which precluded the grant of summary judgment. At the same time, I granted summary judgment in favor of Managing Director Brooks on the state law claims, concluding, with respect to the decision to let the fire burn for a period of time, that there was no evidence on the basis of which the Managing Director could be found to have engaged in willful misconduct. In the course of the January 18 bench opinion, I discussed the Pennsylvania Supreme Court's decision in *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289 (1994), in which "willful misconduct," as that term is used in section 8550 was authoritatively defined. My discussion of *Renk* was as follows:

> That was a case in which a Pittsburgh police officer had been found by a jury in a federal court to have engaged in assault and battery and false imprisonment in undertaking to make an arrest.

> that in a case involving alleged police misconduct, proof that the police conduct constituted a common law tort, such as battery, is sufficient to establish a prima facie case and can only be overcome by defendant's proof that his actions were within 42 Pa.C.S.A. § 8546(1) and (2) [official immunity]. Therefore, official immunity as set forth in Section 8546(2) does not involve evidence that establishes willful misconduct under Section 8550. It was Defendants' burden to show as an affirmative defense that which is available at common law or that their action was authorized by law or they so reasonably believed in good faith.

> As Ms. Africa has proven her claim of battery and Defendants have failed to prove that their use of force was privileged, she is entitled to judgment in her favor. Under this analysis, it is clear that Ms. Africa may recover without proving "willful misconduct" on the part of Defendants, Sambor and Richmond.

Ramona Africa's Response to Defendants' Memoranda Regarding Willful Misconduct at 8.

It is true that the jury, by its verdicts, found (1) that defendants Sambor and Richmond had committed batteries against Ms. Africa and Frank Africa, and that Commissioner Richmond had also committed a battery against John Africa, and (2) that these batteries did not constitute the privileged use of force under Pennsylvania law. But it does not follow that plaintiffs were therefore "entitled to judgment in [their] favor." As noted in the text of this opinion, the Political Subdivision Tort Claims Act confines the tort liability of municipalities to the very limited group of situations described in section 8542(b), and further provides that, as a general matter, a municipal employee can be found liable in tort for actions pursued in the course of duty "only to the same extent as his employing local agency"— unless, pursuant to section 8550, the exclusions from or limitations on liability with which the statute protects a municipal employee are overridden by a judicial determination that the municipal employee's tortious conduct was of a particularly egregious nature. Since the batter-ies found by the jury to have been committed by defendants Sambor and Richmond are not torts comprehended by section 8542(b), and hence are not torts for which the City of Philadelphia can be held liable, defendants Sambor and Richmond cannot be held liable for those torts unless it is "judicially determined" pursuant to section 8550 that the batteries found by the jury constituted, as to each of the individual defendants, that form of egregious conduct denominated "willful misconduct."

This analysis of the statute is confirmed by the opinion of the Commonwealth Court in *Lancie v. Giles*, 132 Pa.Cmwlth. 255, 572 A.2d 827, 830 (1990):

> Under 42 Pa.C.S. § 8545 an employee of a local agency is liable for acts within the scope of his official duties only to the extent that the local agency is liable. 42 Pa.C.S. § 8541 precludes liability of local agencies unless the allegedly injurious act falls under one of the exceptions in 42 Pa.C.S. § 8542.

> Under 42 Pa.C.S. § 8550, however, an employee is not protected by the local agency's immunity if his act constitutes a crime, actual fraud, actual malice, or willful misconduct. . . . Appellants are therefore not protected by governmental immunity with respect to the count of intentional infliction of emotional distress.

> Lastly, appellants assert that common law official immunity protects them from the state law claims. Since we have already decided that the negligence claims are barred by governmental immunity, we must only decide if the intentional infliction of emotional distress claim is barred by official immunity. We conclude that it is not. Common law defenses are preserved by 42 Pa.C.S. § 8546 for use by employees of local agencies. This section does not apply, however, if the employee's act constitutes willful misconduct. 42 Pa.C.S. § 8550. Official immunity therefore cannot protect these police officers from an action alleging an intentional tort.

The police officer then brought a state court proceeding seeking indemnification by the City of Pittsburgh, his employer, for the amount that he had to pay in the federal lawsuit as a judgment.

The defense of the City of Pittsburgh was that Officer Renk's conduct was willful misconduct within the meaning of the statute that we have before us today. A finding of willful misconduct would excuse the City of Pittsburgh from indemnifying its employee.

The Commonwealth Court had found in favor of the City of Pittsburgh. The Supreme Court of Pennsylvania reversed. In a four-to-three decision the majority of the Court concluded that the verdict of the federal jury against Officer Renk did not by itself demonstrate that the wrongful conduct he had engaged in was willful misconduct. It was misconduct, yes, but whether it was willful misconduct was the decisive question and the majority concluded that the jury's verdict was ambiguous; it could not by itself prove that Officer Renk had engaged in willful misconduct. Thus, the majority said:

It is conceivable that a jury could find a police officer liable for those torts under circumstances which demonstrate that the officer did not intentionally use unnecessary and excessive force, or did not deliberately arrest a person knowing that he lacked probable cause to do so. In this case, it is unclear whether the jury in the federal action determined that Renk intentionally used excessive force in arresting Laney, or only that he intentionally used force. Similarly, the jury's verdict does not resolve the issue of whether Renk intentionally arrested Laney knowing that he lacked probable cause to do so, or only that he lacked probable cause to make the arrest.

[641 A.2d at 293–94.]

In short, the standard that appears to have been adopted by the majority in *Renk* was a standard of willfulness that calls for intention to do what is known to be wrong, namely intention to use excessive force in making an arrest knowing that the force used is excessive, or intention to arrest and imprison somebody when the officer knows that he does not have probable cause to make the arrest in question.

*In re City of Philadelphia Litigation,* 938 F.Supp. 1264, 1271 (E.D.Pa.1996).

In denying summary judgment in favor of Commissioners Sambor and Richmond in the January 18 bench opinion, I concluded, on the basis of the *disputed* aspects of the evidentiary record then before me,[9] that there was a possibility that a factfinder could find facts adding up to willful misconduct—as that term had been explicated in *Renk*—on the part of Commissioner Sambor and/or on the part of Commissioner Richmond. The *undisputed* aspects of the evidentiary record seemed to establish that, after the dropping of the explosive device had caused some flames to appear on the roof of 6221 Osage, Commissioner Sambor had a conversation with Commissioner Richmond in which (1) the Police Commissioner asked his colleague whether, if the fire were permitted to continue until it had disabled the bunker, the fire could then be extinguished, and (2) Commissioner Richmond expressed his belief that this was feasible; the undisputed evidence seemed further to establish that in this conversation Commissioner Richmond then acquiesced in Commissioner Sambor's recommendation that the fire be permitted to spread until it disabled the bunker. The undisputed evidence also seemed to establish another conversation—one in which Managing Director Brooks, after seeing substantial flames on the roof of 6221 Osage, called Commissioner Sambor (by radio or telephone) and directed him to put the fire out.[10]

---

**9.** The pertinent evidentiary record primarily consisted of 1985 testimony by Commissioner Sambor, Commissioner Richmond and Managing Director Brooks before the MOVE Commission, an ad hoc investigative body appointed by Mayor Goode to inquire into the events of May 13, 1985. The pertinent evidentiary record also included a

December 29, 1993, letter to this court from John Morris, Esq., counsel to Commissioner Sambor.

**10.** According to Commissioner Sambor, he and Managing Director Brooks had also had a prior conversation in which the Managing Director

At some point—but at just what point is not clear—vigorous firefighting efforts were undertaken; however, the fire spread out of control.

What was chiefly in dispute, on the evidentiary record before me on the motions for summary judgment, was whether for some period of time Commissioner Sambor and/or Commissioner Richmond had ignored Managing Director Brooks' order to put the fire out. It was Commissioner Sambor's position that he had not ignored Managing Director Brooks' order, and indeed had passed word of the order to Commissioner Richmond. It was Commissioner Richmond's position that he had not been advised of any such order. With these salient facts in dispute, I concluded that summary judgment could not be granted. I was of the view that, if Commissioner Sambor and/or Commissioner Richmond had deliberately disregarded an order from their superior, the Managing Director, such deliberate disregard might be found by a factfinder to be evidence—albeit not necessarily conclusive evidence—of an intention to pursue a course of action known to be wrong.

The trial testimony dispelled any possibility that Commissioner Richmond could be found to have disregarded an order from Managing Director Brooks to put out the fire. Commissioner Sambor acknowledged

at trial that he had been in error in his 1985 testimony before the MOVE Commission [11] that Commissioner Richmond had been with him when he was ordered by Managing Director Brooks to put out the fire. So the trial testimony as a whole confirmed Commissioner Richmond's testimony—which I credit—that he knew nothing of the Brooks order. But the trial testimony did not unambiguously resolve the question whether Commissioner Sambor disregarded the Brooks order.[12]

In a post-trial submission, Ms. Africa points to testimony said to establish that the Brooks–Sambor conversation in which the Managing Director ordered that the fire be put out took place *before* the Sambor–Richmond conversation in which the Commissioners agreed to let the fire burn until the bunker was disabled—a sequence which, if correct, would show that Commissioner Sambor was seeking to delay fighting the fire *after* he had been told by the Managing Director to put the fire out. Ms. Africa's analysis of the pertinent testimony is as follows:

> Brooks' testimony showed that he ordered Sambor to extinguish the fire prior to 6:00 p.m. Brooks testified consistently both before the MOVE Commission and this

had acquiesced in Commissioner Sambor's proposal to let the fire burn until it disabled the bunker. Managing Director Brooks denied that such a conversation had taken place. In granting summary judgment in favor of Managing Director Brooks I concluded that even if the Managing Director had agreed to this very limited spread of the flames there would be no basis for concluding that he had engaged in willful misconduct. *In re City of Philadelphia Litigation*, 938 F.Supp. at 1277–78 (E.D.Pa.1996).

**11.** The MOVE Commission was an ad hoc investigative body established by Mayor Goode to determine what went wrong on May 13, 1985. *See* note 9, *supra*. At trial there were many references to MOVE Commission testimony, and some of the MOVE Commission testimony was admitted as substantive evidence. Also, certain limited excerpts from the MOVE Commission's Report were admitted as substantive evidence.

**12.** The question was not one which the jury was required to answer one way or another in order to arrive at its verdicts. It may be added that the larger questions whether defendant Sambor

and/or defendant Richmond engaged in willful misconduct were not questions that were presented to the jury for decision. The jury did find that the two defendants had committed batteries, but the cognate jury finding in *Renk* was insufficient to establish willful misconduct. "Nor is the award of punitive damages sufficient to establish willful misconduct, since reckless conduct may be sufficient to support such an award." *Renk*, 641 A.2d at 294. In the case at bar, the jury was instructed that it could award punitive damages if it found "that a defendant's acts that caused actual injury to the plaintiff were maliciously, wantonly, or oppressively done...." "Maliciously," as defined for the jury, would appear to encompass bad purpose—but, arguably, such bad purpose need not be known to be wrong. "Wantonly" (which includes the concept of "reckless or callous disregard") and "oppressively," as those terms were defined for the jury, could but need not encompass bad purpose, let alone knowing wrongdoing. *See* Jury Instructions at 46–47. Thus, in addressing the issue of willful misconduct, there is no express or necessarily implied jury finding to which I must, pursuant to the Seventh Amendment, conform my findings.

Court that his conversation with Sambor occurred prior to 6:00 p.m. He also testified to having spoken with Mayor Goode ("Goode") directly thereafter; during that conversation he informed Goode that he had already ordered Sambor to put the fire out. Both Brooks and Goode placed the timing of their conversation at approximately 6:05; each placed the phone call at the time he first saw water put on the fire. Deputy Commissioner Scipione ("Scipione") testified that the deluge gun first applied water at approximately 6:02 and was then turned off. Hence, Scipione's testimony supports Brooks' and Goode's recollections of when their conversation, subsequent to Brooks' conversation with Sambor, actually took place—at approximately 6:05. This evidence proves that Sambor willfully disobeyed Brooks' order when he engaged in a conversation with Richmond to allow the fire to continue to burn at 6:08 p.m. to 6:12 p.m. The evidence at trial showed that Sambor concealed the Brooks order by failing to relay that order to Richmond—or to anyone else for that matter.

Ramona Africa's Response to Defendants' Memoranda Regarding Willful Misconduct at 14–15.

There are, in my judgment, three difficulties with this analysis: The first difficulty is that acceptance of the analysis calls for confident reliance on the exact timing, minute by minute, of a series of closely contemporaneous and rapidly unfolding events. But it seems doubtful that such confident reliance is appropriate. The point is illustrated by the following colloquy between Ms. Africa's counsel and Managing Director Brooks (in a videotaped deposition viewed by the jury):

Q. ... And then you testified before the MOVE Commission that at about 5:55, you spoke to Commissioner Sambor. Do you recall that testimony?

A. Yes.

Q. And you were under oath at that time, is that correct? Under oath at that time, when you testified before the MOVE Commission?

A. Yes.

Q. And you believed that to be accurate?

A. As to the preciseness of the moment, no, I do not believe that to be accurate.

Q. No. At the time you testified, you believed that to be accurate, isn't that right? At the time you testified—

A. Testified I believed what—

Q. —and gave information, you believed that you spoke to Commissioner Sambor at 5:55, isn't that right?

A. Oh, at the time I was before the Commission—

Q. Yes.

A. —I believe that the testimony I was giving was precise or pretty near precise, although in that Commission testimony, I say that some of the times we knew, and so when we made the chronology, we backed them up saying this had to have happened four or five minutes or two minutes or so before or after this other event, and that's how we come to whatever degree of preciseness that that 5:55 is.

Q. So give or take two minutes or so?

MR. MORRIS: Objection.

MR. KENNEDY: Objection.

BY MR. DENNIS:

Q. You can answer.

A. If you said give or take five to ten, because we've subsequently learned that the time was stretching a little bit further, but two minutes might be right or six minutes may be right.

Transcript of Deposition of Leo A. Brooks, April 20, 1996, at 76–78. *See also id.* at 166–67, 174–75.

Establishing the *time* at which events took place is significant only to the extent that its resolution helps in establishing the *sequence* of events. Thus, key to plaintiffs' claim that Commissioner Sambor deliberately disregarded the directive to put out the fire is the contention that the Sambor–Richmond conversation was *subsequent* to the Brooks–Sambor conversation in which the Managing Director ordered that the fire be extinguished. And here arises the second difficulty in Ms. Africa's analysis of the evidence at trial. Only one person was in a position to know which conversation came first. That person was Commissioner Sambor, who was

party to both conversations. Commissioner Sambor's testimony at trial was that his conversation with Commissioner Richmond *preceded* his conversation with the Managing Director. Transcript of Testimony, April 26, 1996, at 106, 122–23. *See also id.* at 10–14.[13]

13. Although Commissioner Sambor was firm in his testimony that the Brooks directive followed the Sambor–Richmond conversation, it is not entirely clear at what point Commissioner Sambor thinks he received the Brooks directive. Thus, early in the trial, when called as a (hostile) witness for plaintiffs, Commissioner Sambor testified that the Brooks order was conveyed in a conversation that occurred "within minutes" of the Sambor–Richmond conversation, which had taken place at "approximately 6:00 o'clock or thereabouts." Transcript of Testimony, April 26, 1996, at 106. When cross-examined by his own counsel, Commissioner Sambor spoke of two conversations with the Managing Director. The first was "within minutes" of the Sambor–Richmond conversation, which had taken place "about 6:00, 6:05, somewhere in that area," *id.* at 122; the second was "about 6:25, somewhere in that area," *id.* at 123; and it was in the second conversation that the Managing Director ordered that the fire be put out, *id.*

Considerably later in the trial, when Commissioner Sambor took the stand on his own behalf, he was cross-examined by counsel for Ms. Africa and the following colloquy ensued:

Q. Do you recall General Brooks' testimony by videotape and you were present at that time, that his conversation with you during which he said "You have accomplished your objective, put the fire out," occurred around 5:55?
A. No, sir. I don't recall him stating that specific time as to that message.
Q. Do you recall his stating a general time around 6:00 o'clock?
A. I remember him saying a general time around 6:00 o'clock that he had a phone call or discussion with me, yes, sir.
Q. During which he said "You've accomplished your objective, put the fire out?"
A. Sir, that—he may have said that, but that is not the time that it occurred.
Q. All right, just so I'm clear, your testimony is that it occurred sometime after 6:30?
A. My testimony is that I had three phone calls with the Managing Director, one about smoke, one about fire and one about accomplishing my mission. And the one that accomp—when he said that I accomplished my mission was after this time and I have stated before that it was approximately 6:25 p.m.
Q. Well, when you say after this time, what are you referring to?
A. I'm talking about that I said about 6:25, the M Mary band here says 18:26 or 27, whatever.
Q. So your testimony is that conversation during which he said "You've accomplished your objective, put the fire out" occurred after, after this entry at 18:26?
A. Yes, sir, after he had talked to the Mayor.

Q. All right. Now, isn't it true, sir, that by that time the bunker had fallen through to the second floor?
A. That was how I accomplished my mission.
MR. MORRIS: Your Honor, objection again.
BY MR. DENNIS:
Q. You've accomplished—
THE COURT: One more question, Mr. Dennis, because we're now going beyond the scope of the direct.
MR. DENNIS: Okay, thank you, sir.
BY MR. DENNIS:
Q. You interpreted his statement that you've accomplished your mission, to put the fire out, to mean now that the bunker had fallen through to the second floor?
A. No, sir, that's not—that's not what he meant as according to my interpretation as to what he said when he said that I accomplished my mission. He said that I had accomplished my mission and now to put the fire out.
Q. And—
A. Okay? Now, if I may explain, earlier, the second telephone call that I had from him was when I told him about my conversation with the Fire Commissioner and he said "All right, until you get the bunker."
Then his third call was when he said "You've accomplished your mission" and I construed that to mean that the bunker was no longer a problem and the fire was to be put out.
Q. The second conversation you say you had with him is the conversation he denies he ever had with you, correct?
A. That is correct.

Transcript of Testimony, June 5, 1996, at 42–44.

As the foregoing colloquy shows, Managing Director Brooks stated in his deposition testimony that he had not authorized Commissioner Sambor to let the fire burn until it neutralized the bunker. Deposition Testimony of Leo A. Brooks, April 20, 1996, at 83. Bearing in mind that plaintiffs have the burden of proof on the issue of willful misconduct, I am not persuaded that, confronted with a direct conflict of testimony between the Managing Director and the Police Commissioner, I should find the testimony of the former deserving of greater weight than the testimony of the latter. Moreover, it is to be noted that the form of words Managing Director Brooks recalled using in giving instructions to Commissioner Sambor—"I said we've accomplished the mission, put out the fire," *id.*; for identical or similar formulations, see *id.* at 86, 157—is readily compatible with Commissioner Sambor's testimony that the Managing Director had previously agreed to permitting the flames to advance "until you get the bunker." Transcript of Testimony, June 5, 1996, at 44.

Further, the Managing Director's deposition testimony may be read as in harmony with Commissioner Sambor's insistence that the Richmond–Sambor conversation preceded the Man-

To accept Ms. Africa's analysis of the evidence would mean that one must find that Commissioner Sambor gave false testimony. And it would mean more than that. It would mean—and here we encounter the third difficulty with plaintiffs' analysis—that the Police Commissioner solicited the cooperation of the Fire Commissioner in putting on temporary hold efforts to fight the fire only minutes after the Police Commissioner had been instructed by the Managing Director to put the fire out. Why would Commissioner Sambor have pursued a line of action both insubordinate to his chief and treacherous to his fellow Commissioner, and, therefore, fraught with such grave risks for his own personal and professional standing? The only possible theory which would offer a rationale for such aberrant behavior is that Commissioner Sambor's animus towards MOVE was so great that he would have pursued vengeful actions against occupants of the MOVE house regardless of the costs. On the record made at trial, there is good reason to think that the senior officialdom of the City, and particularly of the police force, including Commissioner Sambor, were indeed hostile to MOVE. But I am not persuaded, by a preponderance of the evidence, that Commissioner Sambor's hostility towards MOVE was so intense and unreasoning as to have led him to undertake as self-ruinous a course of conduct as that attributed to him by the plaintiffs. Moreover, in assessing Commissioner Sambor's demeanor as a witness, I have found him credible.

For these reasons I am not persuaded that the trial testimony establishes, by a preponderance of the evidence, that Commissioner

Sambor was directed by Managing Director Brooks to put out the fire *before* Commissioner Sambor and Commissioner Richmond agreed to delay fighting the fire until the flames disabled the bunker.[14] Accordingly, I conclude that plaintiffs have not established, by a preponderance of the evidence, that Commissioner Sambor deliberately disregarded the order of his superior, the Managing Director.

In concluding that Commissioner Sambor did not deliberately disregard the order of Managing Director Brooks, and that Commissioner Richmond was not even aware of the order, I have resolved, adversely to the plaintiffs, the principal questions which I found to be in dispute in my January 18 bench opinion denying the Sambor and Richmond motions for summary judgment.

The plaintiffs have urged other bases for finding that defendants Sambor and Richmond engaged in willful misconduct. But no other evidence relied on by plaintiffs tends to show that either of the defendants intentionally pursued a course of conduct which he knew to be wrong—the standard of willful misconduct required by the Pennsylvania Supreme Court in *Renk*. The defendants either did, or acquiesced in doing, many things related to the onset and subsequent spread of the May 13 fire that may be deemed, in retrospect, to have been gravely misguided and that entailed tragic consequences. But the evidence adduced at trial does not establish, by a preponderance of the evidence, that any one or more of the actions of either of the defendants constituted willful misconduct.[15] On the record made at trial, the

---

aging Director's instruction to Commissioner Sambor to put out the fire. As Managing Director Brooks recalled the call to Commissioner Sambor in which he ordered that the fire be put out, "Prior to my conversation, he had intentionally—you know, they had allowed it to burn to try to deface the bunker capabilities some more...." Deposition Testimony of Leo A. Brooks, April 20, 1996, at 82.

14. In determining that plaintiffs have not shown that the Managing Director issued his order to Commissioner Sambor before the Sambor–Richmond conversation, I have not placed reliance on the evidence relating to the timing of the Managing Director's efforts to reach Commissioner Sambor either by the "M–Band" radio or the

"150" radio. The evidence seems to me too piecemeal and ambiguous to offer real guidance.

15. Among the items I have considered is the contention that Commissioner Richmond was derelict with respect to his responsibilities under the Home Rule Charter, which provides:

The Fire Department shall have the power and its duty shall be to perform the following functions: (a) *Fires.* It shall extinguish fires at any place within the limits of the City and, upon the request of appropriate authorities and with the authorization of the Fire Commissioner, outside the limits of the City.

Philadelphia Home Rule Charter, 351 Pa.Code § 5.5–400(a) (Fry 1996). There is no ground in

nature and consequences of the decision to let the fire burn in order to disable the bunker were starkly and concisely characterized in a colloquy between Commissioner Richmond and counsel for Ms. Africa:

> A. ... [F]ire fighting's a risky and unpredictable business and it demands judgment—making judgment calls all the time. 99 percent of the time we're right and that's all that was was a judgment call. It was no evil intent or anything else but simply a judgment call.
>
> Q. Well, at this point, sir, just so we're clear, I'm not suggesting by my questioning some evil intent on your part.
>
> A. I accept that.
>
> Q. All right. With respect to the judgment call that you just referred to when you said 99 percent of the time you're right, would you say that this is the one percent where you weren't right?
>
> A. No question.

Transcript of Testimony of William Richmond, May 1, 1996, at 17.

Accordingly, I conclude that defendants Sambor and Richmond are immune from liability with respect to the plaintiffs' state law claims of battery. Those claims will, therefore, be dismissed.

### III.

Plaintiffs have moved to enhance the damages awarded by the jury through the addition of delay damages pursuant to Rule 238 of the Pennsylvania Rules of Civil Procedure. Because, in the previous section of this opinion, I have concluded that plaintiffs'

state law claims must be dismissed, the plaintiffs' motions for delay damages must be deemed to be confined to the jury's verdicts in favor of the plaintiffs and against the City on the plaintiffs' section 1983 claims. However, it is settled that "Rule 238 does not apply to federal claims, such as the section 1983 count in this case, that are adjudicated in federal courts." *Costello v. Daddario*, 710 F.Supp. 1035, 1042 n. 9 (E.D.Pa.1989); *see also Simmons v. City of Philadelphia*, 947 F.2d 1042, 1088 (3d Cir.1991); *Savarese v. Agriss*, 883 F.2d 1194, 1206–08 (3d Cir.1989); *accord, Golden State Transit Corp. v. City of Los Angeles*, 773 F.Supp. 204, 208–10 (C.D.Cal.1991) (citing cases). Accordingly, the motions for delay damages must be denied.

### Conclusion

For the foregoing reasons: (1) The motion of the defendant City of Philadelphia for judgment as a matter of law on the plaintiffs' section 1983 claims will be denied. (2) The motions of defendants Gregore Sambor and William Richmond for dismissal of plaintiffs' state law claims will be granted. (3) The motions of the plaintiffs for delay damages will be denied.

Pending disposition of these motions, no judgment has been entered. Judgments will now be entered (1) in favor of each of the three plaintiffs, and against the defendant City of Philadelphia, on the plaintiffs' federal claims, in the amount of $500,000 for each plaintiff in accordance with the verdicts of the jury; and (2) in favor of defendant Richmond against each of the three plaintiffs, and

---

Pennsylvania law for concluding that the quoted provision constitutes a judicially enforceable mandate to the Fire Commissioner to fight a particular fire in a particular way.

As to the specifics of how, and when, the fire was fought, the record contains voluminous testimony as to the variety of firefighting efforts conducted under the supervision of Commissioner Richmond, Deputy Fire Commissioner Scipione (to whom Commissioner Sambor gave certain orders), and others. In the aggregate, those efforts were too little and too late. But I find no basis in that testimony for drawing inferences that Commissioner Richmond, and/or Commissioner Sambor, engaged in willful misconduct.

I have also considered Mayor Goode's testimony that Commissioner Sambor, in Commis-

sioner's Richmond's presence, acknowledged in response to a question from the Mayor that letting the fire burn was his decision and was intended to force the occupants of 6221 Osage Avenue out of the house. Transcript of Testimony, April 24, 1996, at 69–70; Transcript of Testimony, April 25, 1996, at 40. Both Commissioner Richmond and Commissioner Sambor denied that Commissioner Sambor said this to the Mayor. Transcript of Testimony, May 3, 1996, at 157; Transcript of Testimony, June 5, 1996, at 26. Assuming, however, that Commissioner Sambor did make such a statement to the Mayor, the making of the statement does not, without more, establish that Commissioner Sambor pursued such a course of action knowing it to be wrong.

in favor of defendant Sambor against plaintiffs Ramona Africa and Louise James Africa (plaintiff Alfonso Leaphart not having brought suit against defendant Sambor), on the plaintiffs' state law claims.

An appropriate order accompanies this opinion.

## ORDER

For the reasons given in the accompanying opinion, it is hereby ORDERED that:

1. The motion of the defendant City of Philadelphia for judgment as a matter of law in its favor and against plaintiffs Ramona Africa, Louise James Africa and Alfonso Leaphart, with respect to the claims arising under 42 U.S.C. § 1983, is DENIED.

2. (A) The motion of defendant William C. Richmond for dismissal of the state law claims of Ramona Africa, Louise James Africa and Alfonso Leaphart is GRANTED and JUDGMENT is hereby ENTERED in favor of defendant Richmond and against the three named plaintiffs.

(B) The motion of defendant Gregore Sambor for dismissal of the state law claims of plaintiffs Ramona Africa and Louise James Africa is GRANTED and JUDGMENT is hereby ENTERED in favor of defendant Sambor and against plaintiffs Ramona Africa and Louise James Africa.

3. The motions of plaintiffs Ramona Africa, Louise James Africa and Alfonso Leaphart for delay damages are DENIED.

4. In accordance with the jury verdicts of June 24, 1996, JUDGMENT is hereby ENTERED:

(A) in favor of plaintiff Ramona Africa and against defendant City of Philadelphia in the sum of $500,000;

(B) in favor of plaintiff Louise James Africa and against defendant City of Philadelphia in the sum of $500,000;

(C) in favor of plaintiff Alfonso Leaphart and against defendant City of Philadelphia in the sum of $500,000.