

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-1998

# In Re: City of Phila

Precedential or Non-Precedential:

Docket 96-2127

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"In Re: City of Phila" (1998). *1998 Decisions.* Paper 223.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/223

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-2127

IN RE: CITY OF PHILADELPHIA LITIGATION
(D.C. Civil No. 85-cv-02745)

RAMONA AFRICA

v.

CITY OF PHILADELPHIA; WILLIE GOODE; LEO A.
BROOKS; GREGORE SAMBOR; WILLIAM RICHMOND;
FRANK POWELL, LT.; WILLIAM KLEIN, OFFICER;
MICHAEL TURSI, OFFICER; ALBERT REVEL, SGT.;
EDWARD CONNOR, SGT.; MORRIS DEMSKO, CORPORAL;
RICHARD REED, STATE TROOPER, Individually and in
their present and/or former official capacities
(D. C. Civil No. 87-cv-02678)

        City of Philadelphia,

        Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. Nos. 85-cv-02745 & 87-cv-02678)

Argued
January 27, 1998

Before: MANSMANN, COWEN and ALITO, Circuit Judges.

(Filed September 9, 1998)

Andre L. Dennis, Esquire (ARGUED)
Danielle Banks, Esquire
Stradley, Ronon, Stevens & Young
2600 One Commerce Square
Philadelphia, PA 19103

 Counsel for Appellee

Judith E. Harris, Esquire (ARGUED)
Morgan, Lewis & Bockius
2000 One Logan Square
Philadelphia, PA 19103

 Counsel for Appellant

OPINION OF THE COURT

MANSMANN, Circuit Judge.

On May 13, 1985, now more than thirteen years ago, the City of Philadelphia police dropped a bomb on 6221 Osage Avenue, a building occupied by several members of a group called "MOVE," killing eleven of the thirteen people inside, devastating the West Philadelphia community, and bringing national attention to the actions taken that day by the City of Philadelphia officials involved in the incident. This appeal requires us to revisit that confrontation.

Only two parties have participated in this appeal, whittled down from the dozens of plaintiffs and defendants previously involved in this massive litigation. Here, the City of Philadelphia appeals that portion of the judgment entered against it and in favor of Ms. Ramona Africa on her civil rights claim under 42 U.S.C. S 1983.1

The City's sole argument on appeal is that, as a matter
_____

1. Ms. Africa has filed a separate appeal from that portion of the judgment entered against her and in favor of William Richmond, Philadelphia's former Fire Commissioner, and Gregore Sambor, Philadelphia's former Police Commissioner, on her state law battery claims. In a companion case decided today, we have affirmed the judgment in favor of Richmond and Sambor. See In re City of Phila. Litig., ___ F.3d ___ (3d Cir. 1998).

2

of law, its conduct did not amount to a seizure under the Fourth Amendment. We hold that because the evidence contained in the summary judgment record, upon which we previously relied to determine that the City's actions were sufficient to constitute a Fourth Amendment seizure, was also presented at trial, we are bound under the law of the case doctrine to our prior seizure determination. Accordingly, in conformance with our prior holding, we are required to reject the City's argument that its conduct was legally insufficient to constitute a Fourth Amendment seizure. We therefore will affirm the judgment entered on Ms. Africa's civil rights claim against the City.

I.

The controversial events forming the basis of this litigation were highly publicized and have been recounted in several published opinions. See, e.g., In re City of Phila. Litig., 49 F.3d 945 (3d Cir. 1995); In re City of Phila. Litig., 938 F. Supp. 1278 (E.D. Pa. 1996); In re City of Phila. Litig., 849 F. Supp. 331 (E.D. Pa. 1994); Africa v. City of Phila., 809 F. Supp. 375 (E.D. Pa. 1992). Accordingly, we will assume familiarity with this case and will present only an abbreviated synopsis of the background relevant to this appeal.

A.

On May 11, 1985, arrest warrants were issued for several MOVE members, including Ms. Africa, and search warrants were issued for 6221 Osage Avenue in West Philadelphia upon a judicial finding of probable cause. After Philadelphia's district attorney informed Philadelphia Mayor Wilson Goode that the court had issued the warrants, Goode instructed Police Commissioner Gregore Sambor to execute the warrants.

The City evacuated residents from the Osage Avenue neighborhood on May 12, 1985. At approximately 3:00 a.m. the next morning, police and firefighters assumed their positions surrounding 6221 Osage Avenue. At approximately 5:30 a.m., Commissioner Sambor announced over a bullhorn that the MOVE residents had fifteen

3

minutes to vacate the premises and surrender. MOVE members responded over a loudspeaker with threats of violence. After the allotted time elapsed, the City began attempts to infuse the house with tear gas to force evacuation.

Police entered adjoining houses in order to blow holes in common walls for the insertion of tear gas canisters. During the attempts to infuse the tear gas, MOVE membersfired on police officers from within 6221 Osage Avenue and from a wooden bunker located on the roof of the building. Due to the gunfire and the fact that MOVE had fortified the common walls, the infusion attempts proved ineffective. As a result, the police retreated from the adjoining buildings.

Sometime around 4:00 p.m. that afternoon, City officials met to discuss a new strategy. They concluded that any further attempt to execute the warrants by gassing the house would fail as long as the bunker on the roof afforded MOVE members a tactical advantage. After considering several alternatives, they agreed to drop a satchel containing explosives onto the bunker from a helicopter. The officials hoped that this "bomb" would disable the bunker or blow a hole in the roof through which tear gas could be inserted.[2]

Shortly after the police dropped the bomb, a fire broke out on the roof. Upon learning of the fire, Police Commissioner Gregore Sambor and Fire Commissioner William Richmond conferred and determined that they should let the fire burn until it neutralized the bunker. Richmond's sworn testimony before the MOVE Commission on October 30, 1985 regarding this conversation, which was played to the jury, was as follows:

> Commissioner Sambor said to me something to the effect, "Can we control that fire?" And my response --

---

2. The term "bomb" may have connotations which do not accurately reflect the properties of the device the City employed. Testimony established that prior to the dropping of the device, the possibility of a fire resulting from its application was determined to be negligible. In addition, the explosives used were not encased in metal. For purposes of simplicity, however, we will use the term "bomb" to denote the device the City dropped on the bunker.

and I'm a cautious person by nature. I said, "I think we can . . . ."

\* \* \*

I told him essentially that, that I thought we could contain the spread at that point. He said, "Let's let the bunker burn to eliminate the high ground advantage and the tactical advantage of the bunker," and I said, "Okay." I acquiesced, I agreed.

This testimony was consistent with Sambor's testimony at trial; Sambor testified that he asked Richmond if he could control the fire if they "let the fire go to get the bunker" and that Richmond responded in the affirmative.

Mayor Goode, who had returned to City Hall, never authorized the use of fire as a police tactic and testified that he would have ordered Richmond to put the fire out immediately had anyone contacted him. Philadelphia Managing Director Leo Brooks remained on the scene and testified that he ordered Sambor to have the fire put out as soon as he noticed the fire and was able to contact Sambor. Brooks' testimony conflicted with other trial testimony, however, that suggested that Brooks initially acquiesced in the decision to let the fire burn. In re City of Phila. Litig., 938 F. Supp. at 1289–90 n.10, 1292–93 n.13 (discussing conflicting testimony).

Sometime after the City officials noticed thefire, Brooks ordered Sambor to put the fire out and firefighters began taking steps to fight the fire. The fire, however, burned out of control despite the City's efforts to fight it. The roof eventually caved in, the bunker dropped through to the second floor, and the fire consumed the house and burned numerous neighboring buildings. With the exception of Ms. Africa and one child, who emerged from the house approximately two hours after the bomb fell, everyone inside the building perished. Ms. Africa was taken into custody without resistance after evacuating the burning building.

B.

The confrontation spawned scores of lawsuits, most of which settled before trial. In re City of Phila. Litig., 938 F.

Supp. at 1280. Ms. Africa asserted several claims against various defendants including the claim at issue in this appeal, a claim based upon 42 U.S.C. S 1983 alleging an unreasonable seizure in violation of the Fourth Amendment.

The individual defendants moved for summary judgment on Ms. Africa's section 1983 claim arguing that there was no constitutional violation, and, in the alternative, that they were entitled to qualified immunity. In re City of Phila. Litig., 849 F. Supp. at 355, 359. The district court granted summary judgment on Ms. Africa's section 1983 claim in favor of all defendants with respect to the decision to drop the bomb. See In re City of Phila. Litig., 910 F. Supp. 212, 214 (E.D. Pa. 1995)(explaining the import of the January 3, 1994 bench opinion and the January 5, 1994 order). The district court denied summary judgment, however, in favor of defendants Richmond, Sambor and Brooks holding that those defendants were not entitled to qualified immunity with respect to their decision to let the fire burn. In re City of Phila. Litig., 849 F. Supp. at 342, 345. In addition, the court held that the City was not entitled to summary judgment because Brooks, Sambor, and Richmond were final policymakers whose decision to let the fire burn could bind the City under Monell v. Department of Social Servs. of the City of New York, 436 U.S. 658 (1978). Id. at 345-46.

In the days that followed, the parties filed various motions requesting the court to facilitate an immediate appeal. Finding that the interests of justice warranted immediate appellate review, the court entered final judgment pursuant to Fed. R. Civ. P. 54(b) on all claims in favor of Goode and several other individual defendants, but not Brooks, Richmond or Sambor. The court also certified for interlocutory appeal under 28 U.S.C. S 1292(b) that portion of its order denying summary judgment to the City. Specifically, the court certified for appeal the issue of whether Brooks, Richmond or Sambor are final policymakers whose decision could bind the City for purposes of Ms. Africa's section 1983 claim. In re City of Phila. Litig., 1994 WL 46654, at *8 (E.D. Pa. Feb. 1, 1994). The parties appealed.

We reversed in part, affirmed in part, and dismissed in part for lack of jurisdiction. In re City of Phila. Litig., 49 F.3d 945 (3d Cir. 1995).3 With respect to the individual defendants' appeal of the district court's order denying them summary judgment on the basis of qualified immunity, we unanimously determined the collateral order doctrine as set forth in Mitchell v. Forsyth, 472 U.S. 511 (1985), provides us with jurisdiction to consider the qualified immunity issue. Id. at 956–57.

In analyzing the qualified immunity issue, we applied the familiar test announced in Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." In keeping with the Harlow test, we first considered whether Ms. Africa had alleged facts that stated an excessive force claim. See Siegert v. Gilley, 500 U.S. 226, 232–33 (1991). We concluded that Ms. Africa alleged a constitutional violation by alleging that the defendants exerted excessive force in attempting to effectuate her arrest by dropping a bomb on the roof and letting the fire burn. In re City of Phila. Litig., 49 F.3d at 962.

Having concluded that Ms. Africa alleged unconstitutional conduct, we next examined the undisputed factual record to determine whether Ms. Africa possessed a clearly established constitutional right to be free from the forces allegedly exerted by the individual defendants under the circumstances that existed on May 13, 1985. Id. at 962–69, 973–75. As part of this inquiry, we determined that under the summary judgment record as examined in the light most favorable to Ms. Africa, the evidence was sufficient to support a finding that the bomb

_____

3. Our decision included opinions from each judge on the panel. See id. at 948 (Opinion of Greenberg, J.), 973 (Opinion of Scirica, J.), 976 (Opinion of Lewis, J.). Because an agreement on any given issue of two of the three judges constitutes our holding on that issue, our holdings are found by compiling various statements found throughout the three opinions.

7

and resulting fire effectuated a Fourth Amendment seizure because they were the very instrumentalities set in motion in order to arrest Ms. Africa. Id. at 973-74, 976; see also Brower v. County of Inyo, 489 U.S. 593 (1989).

Once we determined that the summary judgment record supported a Fourth Amendment seizure, we next examined whether the individual defendants actions were objectively reasonable as a matter of law. In re City of Phila. Litig., 49 F.3d at 965-69, 974, 976-78. We determined that they were not. We found that under the summary judgment record, a reasonable jury could conclude that the decision to use the bomb was an excessive use of force. Id.

We next analyzed whether the defendants reasonably could have considered their actions to be lawful. Id. at 970-72. We determined that they could. We reasoned that because "[t]he 1985 MOVE confrontation was unprecedented in the case law," it was not possible to say that the unlawfulness of either dropping the bomb or letting the fire burn should have been apparent to a reasonable law enforcement official. Id. at 971-72. We accordingly granted all individual defendants qualified immunity.

In analyzing the City's liability in allowing thefire to burn, we concluded that because the decisions of Brooks, Richmond and Sambor could fairly be attributed to the City under Monell v. Department of Social Servs., 436 U.S. 658 (1978), the City was not entitled to summary judgment. In re City of Phila. Litig., 49 F.3d at 972, 975. We also suggested that, in light of our holding on the City's liability for allowing the fire to burn, Ms. Africa may wish to seek relief from the district court's decision granting partial summary judgment in favor of the City on the decision to drop the bomb. Id. at 973.4 On remand, the district court reinstated the "drop the bomb" claim against the City at Ms. Africa's request. In re City of Phila. Litig., 910 F. Supp. 212, 216-18 (E.D. Pa. 1995).

Trial commenced on April 23, 1996 and continued into

_____

4. Ms. Africa had not appealed the district court's ruling that the City was entitled to summary judgment on the decision to drop the bomb. Id.

8

the summer of 1996. The City moved for judgment as a matter of law at the close of the evidence on June 7, 1996, contending that Ms. Africa was never seized in violation of the Fourth Amendment. The court denied that motion. On June 24, 1996, the jury returned a verdict in favor of Ms. Africa and against the City on her section 1983 claim.

Following the verdict, the City orally renewed its motion for judgment as a matter of law in open court under Fed. R. Civ. P. 50(b). The court denied the City's motion. In re City of Phila. Litig., 938 F. Supp. 1278, 1282–84 (E.D. Pa. 1996). In considering the City's motion, the court interpreted our previous decision as holding that a jury could reasonably find a seizure based on the summary judgment record. The court specifically rejected the City's position that, as a matter of law, no seizure occurred because "the substance of the argument has already been rejected by the Court of Appeals." Id. at 1283. Noting that the trial evidence did not materially deviate from the summary judgment evidence before us, the court interpreted our prior decision as precluding relitigation of the seizure issue. Id. at 1284. Accordingly, the district court entered final judgment against the City on Ms. Africa's section 1983 claim by order dated August 27, 1996. The City filed this timely appeal.

II.

In this appeal, the primary inquiry before us is the extent to which we are now bound by our prior determination that, under the summary judgment record, the City seized Ms. Africa. Specifically, we must determine the extent to which that prior determination controls our resolution of the City's assertion that its conduct was legally insufficient to constitute a Fourth Amendment seizure. To resolve this issue, we must initially determine whether our prior determination constitutes the law of the case.

Under the law of the case doctrine, one panel of an appellate court generally will not reconsider questions that another panel has decided on a prior appeal in the same case. The doctrine is designed to protect traditional ideals such as finality, judicial economy and jurisprudential

9

integrity. Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988); Arizona v. California, 460 U.S. 605, 618-19 (1983). The law of the case doctrine, however, acts to preclude review of only those legal issues that the court in a prior appeal actually decided, either expressly or by implication; it does not apply to dicta. Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co., 988 F.2d 414, 429 (3d Cir. 1993).

In addition, the law of the case doctrine does not restrict a court's power but rather governs its exercise of discretion. Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 116 (3d Cir. 1997). Accordingly, we have recognized that the doctrine does not preclude our reconsideration of previously decided issues in extraordinary circumstances such as where: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice. Id. at 116-17.

In order to determine whether the law of the case doctrine governs our resolution of this appeal, we therefore must determine: (1) whether our prior determination on seizure was dicta; and (2) whether this case falls into any of the categories of extraordinary circumstances which would free us from the constraints of the law of the case doctrine.

A.

The City contends that the prior panel's seizure analysis is dicta because a determination on whether a seizure existed under the summary judgment record was not required for our resolution of the issues on appeal. Specifically, the City asserts that the prior panel only had jurisdiction to determine: 1) whether the district court had properly granted summary judgment on the grounds of qualified immunity in favor of certain defendants; 2) whether the district court had improperly denied summary judgment on the grounds of qualified immunity to certain other defendants; and 3) whether the district court had improperly denied the City summary judgment on the federal claim by finding that the City could be held liable

10

for the individual defendants' actions. The City argues that because the court's seizure analysis was not required for its resolution of any of these issues, that analysis is dicta and therefore does not bind us under the law of the case doctrine. The City also contends that it would be unfair for us to apply the prior panel's determination on seizure to the City because the City did not brief the issue in the prior appeal and because the issue arose in the context of the individual defendants' appeal of the district court's qualified immunity ruling. We disagree with both contentions.

It is axiomatic that the qualified immunity inquiry focuses on whether an official's conduct violated clearly established constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is equally clear that the threshold determinations which inform a court's qualified immunity analysis are whether the plaintiff has asserted a violation of a constitutional right and whether that constitutional right was clearly established at the time the defendants allegedly violated that right. Siegert v. Gilley, 500 U.S. 226, 232 (1991). In determining whether a defendant's conduct impinged upon clearly established constitutional rights, the courts are required to conduct more than a generalized inquiry into whether an abstract constitutional right is implicated. Anderson v. Creighton, 483 U.S. 635, 639–40 (1987). The level of specificity required must establish that the contours of the constitutional right alleged are sufficiently clear that a reasonable official would understand that his actions violate that right. Id. at 640. Accordingly, a court's determination as to whether an official's conduct violated clearly established law must be premised upon an application of the facts as alleged by the plaintiff to the constitutional standards which were clearly established at the time of the official's conduct. See Crawford–El v. Britton, 118 S. Ct. 1584, 1597 (1998)(noting that in resolving the threshold issue of qualified immunity, "the court must determine whether, assuming the truth of the plaintiff 's allegations, the official's conduct violated clearly established law."); Grant v. City of Pittsburgh, 98 F.3d 116, 121–22 (3d Cir. 1996)(holding that the qualified immunity inquiry requires an analysis of the summary judgment record, in the light most favorable to the plaintiff,

11

to establish if the specific actions alleged violated a clearly established constitutional right).

The prior panel therefore was required to determine whether the actions of the City officials, as alleged by Ms. Africa, violated her Fourth Amendment right to be free from an unreasonable seizure as that right was understood at the time by reasonable City officials. Inherent in this inquiry is the determination of whether the City officials' alleged actions rise to the level of a Fourth Amendment violation; if the alleged actions are insufficient to amount to a Fourth Amendment violation, the City officials' actions could not possibly violate a clearly established constitutional right. Resolution of the question of whether there was a Fourth Amendment violation based upon the summary judgment record therefore was integral to the court's qualified immunity analysis.

This conclusion is amply supported by the decisions of our sister courts of appeals that have resolved the qualified immunity inquiry by holding that the defendants were entitled to qualified immunity because their alleged conduct did not rise to the level of a constitutional violation. See, e.g., Jones v. Collins, 132 F.3d 1048, 1052 (5th Cir. 1998)(determining on interlocutory appeal that the defendant was entitled to qualified immunity because the summary judgment evidence, construed in the light most favorable to the plaintiff, indicates that the defendant did not violate plaintiff 's constitutional rights); Latta v. Keryte, 118 F.3d 693, 699 (10th Cir. 1997)(granting qualified immunity to defendants in part because plaintiff had not established a Fourth Amendment seizure); Roe v. Sherry, 91 F.3d 1270, 1273–74 (9th Cir. 1996)(granting qualified immunity to defendants because plaintiff had not established the violation of a constitutional right). As illustrated by these cases, the prior panel could have disposed of the qualified immunity issue by holding that the defendants' alleged conduct did not rise to the level of a constitutional violation. In fact, one of the three judges on the prior panel would have so held. See In re Phila. Litig., 49 F.3d at 962–65 (Greenberg, J., dissenting in part). Accordingly, the panel's seizure determination was necessarily subsumed within the court's analysis of the

qualified immunity issue and therefore does not constitute dicta to which the law of the case doctrine would not apply.5

Furthermore, we are not persuaded by the City's secondary argument that applying the prior panel's seizure ruling to the City would be unfair because that issue was analyzed with respect to the individual defendants and because the City did not brief the issue. The City's appeal was before us because the district court certified its order denying the City's motion for summary judgment pursuant to 28 U.S.C. S 1292(b). As the Court made clear in Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 204 (1996), appellate courts may exercise jurisdiction over any question that is fairly included in an order certified for interlocutory appeal; our jurisdiction is not limited to examining only that

_____

5. We need not be detained by the City's argument that because our jurisdiction over the issue of qualified immunity was premised upon the collateral order doctrine, we lacked jurisdiction to determine the seizure issue under Mitchell v. Forsyth, 472 U.S. 511 (1985). In Mitchell, the Court emphasized that the denial of qualified immunity is appealable under the collateral order doctrine because a question of immunity is separable from the merits of the underlying action. Mitchell, 472 U.S. at 527-29. The Court in Mitchell also recognized, however, that while an immunity claim is conceptually distinct from the merits of the plaintiff 's
claim, courts must nonetheless consider plaintiff's factual allegations in resolving the immunity issue. Id. at 528-29. It is clear from a close reading of Mitchell and from subsequent qualified immunity jurisprudence that while the collateral order doctrine does not afford jurisdiction to determine the ultimate merits of a constitutional claim, the collateral order doctrine does afford courts the jurisdiction to effectively examine the merits of a claim for qualified immunity by determining whether, under the summary judgment record as examined in the light most favorable to the plaintiff, the defendant's actions violate
a clearly established constitutional right. Furthermore, we have already implicitly rejected the City's argument on this point in Brown v. Grabowski, 922 F.2d 1097, 1109-11(3d Cir. 1990), where we held that nothing in Mitchell precludes our review of whether the evidence adduced by the plaintiff as to the conduct of the defendants substantiates the violation of a cognizable constitutional claim. We therefore are confident that the prior panel had jurisdiction under the collateral order doctrine to determine whether, under the largely undisputed summary judgment record examined in the light most favorable to Ms. Africa, the City officials' actions were sufficient to constitute a Fourth Amendment seizure.

question that the district court has identified in its certification. Had the prior panel concluded that a seizure had not occurred as a matter of law, the panel could have disposed of the City's appeal on that basis. Accordingly, the City had fair warning that the seizure issue could be considered on appeal and nothing precluded the City from briefing the issue.

B.

Having determined that our prior seizure determination is not dicta and is therefore subject to the law of the case doctrine, we turn to our evaluation of whether any of the traditional exceptions to the law of the case doctrine apply to free us from its constraints. Specifically, wefind it necessary to examine two of our three previously recognized exceptional circumstances: whether new evidence is available and whether our prior decision was clearly erroneous and would work a manifest injustice.

1.

The district court concluded that the evidence presented at trial did not significantly deviate from the summary judgment record and the City has not challenged that assessment on appeal. In re Phila. Litig., 938 F. Supp. at 1284. After independently reviewing the trial testimony and the summary judgment record, we also find that the evidence presented at each of these stages of this proceeding was substantially similar. Compare In re Phila. Litig., 49 F.3d at 948-52 (recounting the factual background from the summary judgment record upon which the first panel based its decision) with our recitation of the facts as adduced at trial, supra, Section I-A.

The sole significant exception to this conclusion relates to trial testimony offered by Mayor Goode. At trial, Goode testified that immediately prior to a press conference regarding the May 13, 1985 events, Goode confronted Richmond and Sambor as they were walking down the hall towards the Mayor's Reception Room and asked them who gave the order to let the fire burn. Goode testified that Sambor responded that he had given the order and that he

14

was trying to get MOVE members out of the building. It is not evident that similar testimony from the summary judgment record was drawn to the prior panel's attention in the initial appeal.

Even though this additional evidence may not have been considered in the prior panel's analysis, we do notfind that this "new evidence" warrants a departure from the law of the case doctrine. This additional evidence acts only to support the prior panel's conclusion that a seizure occurred; it does not detract from the evidence at the summary judgment stage upon which the panel relied. Accordingly, because all of the summary judgment evidence upon which the panel relied in determining that the City had effectuated a seizure was presented at trial, the exceptional circumstance of new evidence does not apply to preclude the application of the law of the case doctrine to this case.

2.

We turn now to the exceptional circumstance presented when a prior determination is clearly erroneous and would work a manifest injustice. In determining whether we should refuse to treat our prior decision as law of the case under this exception, we are reminded that the question of whether Ms. Africa was seized as a matter of law is not before us as a matter of first impression. The prior panel, to which we owe a certain degree of deference, has already ruled on this issue. Our current task is to evaluate that prior determination solely for clear error. It is therefore incumbent upon the City to persuade us not only that our prior decision was wrong, but that it was clearly wrong and that adherence to that decision would create manifest injustice. This the City has failed to do.

At this stage of the litigation, we need only address the merits of the City's seizure argument to the degree necessary to determine whether the prior panel's decision was clearly wrong. The City contends that under Brower v. County of Inyo, 489 U.S. 593 (1989), their conduct does not constitute a seizure as a matter of law. Specifically, the City argues that the bomb was not intended to effectuate Ms.

15

Africa's seizure but rather was a measure taken solely against the bunker. Accordingly, Ms. Africa's freedom of movement, the City argues, was not terminated through the very means intentionally applied to effectuate her seizure as required by Brower.

In Brower, the Supreme Court set forth the current standard for evaluating Fourth Amendment seizures. The Court ruled that a police effectuated roadblock specifically designed to stop a fleeing suspect constitutes a seizure under the Fourth Amendment. In so holding, the Court noted that violation of the Fourth Amendment requires an intentional acquisition of physical control and that although a seizure occurs even when an unintended person or thing is the object of the detention, the detention itself must be willful. Brower, 489 U.S. at 596.

To further explicate the intent element necessary for a Fourth Amendment seizure, the Court offered the following hypotheticals:

> Thus, if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment. And the situation would not change if the passerby happened, by lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant -- even if, at the time he was thus pinned, he was in the process of running away from two pursuing constables. It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied. That is the reason there was no seizure [when a suspect lost control and crashed during a police chase.] The pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was

16

stopped by a different means –– his loss of control of his vehicle and the subsequent crash. If, instead of that, the police cruiser had pulled alongside thefleeing care and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure.

Id. at 596–97(emphasis in original). The Court also made clear that in determining whether the means that terminates the freedom of movement is the very means the government intended, it is impractical to conduct an inquiry into an officer's subjective intent. As clarified by the Court:

> In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

Id. at 598–99.

In our prior decision, we applied the teachings of Brower and determined that there had been a seizure based upon the summary judgment record. Specifically, we held that the bomb was the very instrumentality set in motion in order to achieve the seizure of the MOVE members. In re Phila. Litig., 49 F.3d at 974. We analogized this situation to one of the hypotheticals offered by the Brower Court, i.e., the seizure that results when a person is stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned. Id. We reasoned that our inquiry is not whether the officials intended all of the consequences of their use of the bomb, but rather whether they intended to use force to arrest the MOVE members. We concluded that they did and that the City actions therefore amounted to a seizure under Brower. Id. (citing Brower, 489 U.S. at 599).

We find this to be a plausible reading of Brower. While courts have struggled with conflicting language in Brower

17

and have often reached contrary results, we think it reasonable to read Brower as focusing on the objective intent of officials to use force to effectuate a seizure and the subsequent seizure flowing from the use of that force, rather than upon the subjective intent of officials to effectuate a seizure by the exact use of force they have chosen to employ. See generally, Keller v. Frink, 745 F. Supp. 1428 (S.D. Ind. 1990)(applying Brower to hold that a jury could find that an officer seized a fleeing suspects when he fired his weapon at the suspects' van, purportedly to identify it for future identification, and inadvertently shot the driver in the back). While the prior panel's seizure analysis was certainly not mandated by Brower, neither was it precluded by Brower. Accordingly, wefind that our prior seizure determination was not clearly erroneous.

Because we find that our prior seizure determination is not clearly erroneous, the exceptional circumstance of a clearly erroneous decision that would work a manifest injustice does not apply to preclude the application of the law of the case doctrine. Even if we were to conclude that our prior decision was clearly erroneous, however, we would nevertheless adhere to that ruling because it does not create a manifest injustice in this case. As previously noted, Mayor Goode testified at trial that Sambor told him that he let the fire burn to force the MOVE members out of the house. Were we to assume the veracity of this testimony, which we must, we would easily conclude that, under any reading of Brower, the jury could reasonably conclude that the City effectuated a seizure of Ms. Africa in this case. Accordingly, adherence to our prior seizure analysis, even if erroneous under the summary judgment record, does not create a manifest injustice as applied post-trial in light of Goode's trial testimony.

Because our prior holding on the seizure issue is not dicta and because none of our traditionally recognized exceptional circumstances preclude application of the law of the case doctrine to that determination, we find that our prior determination that the City seized Ms. Africa under the summary judgment record is the law of this case.

18

III.

Our determination that our prior seizure ruling is subject to the law of the case doctrine, however, does not end our inquiry. While we have determined that we are bound by our prior ruling, the question we have yet to answer is the extent to which our prior panel's holding that a seizure occurred under the summary judgment record binds us in our determination of whether the City is entitled to judgment as a matter of law post-trial.

We recognize that the issue currently before us is not identical to the issue we previously determined. As previously noted, however, the evidence contained in the summary judgment record upon which we previously relied to determine that the City's actions were sufficient to constitute a Fourth Amendment seizure, was also presented at trial. In addition, nothing presented at trial detracted from the summary judgment evidence upon which we based our seizure determination. We therefore find that because the evidence was at least as strong at trial on the issue of seizure as it was at the summary judgment stage, our prior ruling that a seizure occurred controls our resolution of this appeal. Accordingly, we hold that the City's actions were legally sufficient to constitute a seizure. Any other ruling would insufficiently adhere to our prior resolution of the seizure issue which is the law of this case.

IV.

For the foregoing reasons, we will affirm the judgment entered against the City on Ms. Africa's section 1983 claim.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

19